No. 25,906.

EMMA L. PIAZZEK, as Administratrix, etc., *Appellant*, v. THE DRAINAGE DISTRICT No. 1, *Appellee*.

### SYLLABUS BY THE COURT.

1. WATERS—*Riparian Rights in Nonnavigable Rivers*. The terms "public waters" and "navigable waters" are ordinarily synonymous. The term "private waters" is ordinarily used to designate nonnavigable waters. The title to the beds of nonnavigable rivers is in the riparian owners and not in the state.

2. SAME—*Public Streams—Delaware River*. The Delaware river is not a public or navigable stream.

3. SAME—*Riparian Owners—Rights Under Government Patent*. A patent from the government, conveying land through which the Delaware river runs, conveyed to the patentee the bed of the river.

4. DRAINS—*Power of Drainage District—Destruction of Milldam*. A drainage district organized under chapter 168 of the Laws of 1911 was without authority to destroy a milldam which had been operated and maintained in the Delaware river for sixty years, without compensation to its owner.

5. SAME—*Destruction of Milldam—Measure of Damages*. The measure of damages for the destruction or removal of a milldam is the difference between the value of the mill property as a going concern before its removal and its value after the removal has taken place.

Appeal from Jefferson district court; MARTIN A. BENDER, judge. Opinion filed July 11, 1925. Reversed.

---

1. Waters, 40 Cyc. p. 553; 42 L. R. A. 322; 1 L. R. A. (N. S.) pp. 745, 762; 27 R. C. L. p. 1359. 2. Naval Waters, 29 Cyc. p. 289. 3. Waters, 40 Cyc. p. 620. 4. Eminent Domain, 20 C. J. § 134. 5. Id., 20 C. J. § 213.

*Oscar Raines,* of Topeka, and *H. T. Phinney,* of Oskaloosa, for the appellant.

*James W. Orr* and *C. J. Conlon,* both of Atchison, for the appellee.

The opinion of the court was delivered by

Hopkins, J.: This is an appeal from an award of damages allowed by appraisers in the condemnation of property by a drainage district.

On October 27, 1920, drainage district No. 1 of Jefferson county condemned the milldam of J. M. Piazzek, located near Valley Falls. Upon application of the drainage district the judge of the district court appointed appraisers to appraise the damage. The appraisers filed their report, appraising the damage at $500, and on November 6 Piazzek appealed from the award to the district court. On January 21, 1921, Piazzek died. The present plaintiff was appointed administratrix of his estate, and the action revived in her name. On October 6, 1921, the drainage district/ destroyed and removed the milldam. The plaintiff then filed her petition in this action for damages on account of the removal and destruction of the property. Issues were made up and the case tried to a jury. Before the introduction of any evidence on the trial the defendant asked leave of court to abandon its condemnation proceedings and for an order on the county treasurer to return to it the deposit of $500.

The court denied plaintiff the right to introduce evidence of damages sustained on account of the removal and destruction of the milldam and water power; sustained a demurrer to plaintiff's evidence, and rendered judgment for defendant for costs.

The controversy turns on whether the Delaware river is a "public stream" and whether its bed is owned by the state or the plaintiff. The defendant contends that the river is a public stream; that the plaintiff was a trespasser therein, and the drainage district had authority to remove the dam as an obstruction without compensation to the owner. On the other hand, plaintiff contends that the Delaware river is not a public stream; that Piazzek and his predecessors obtained a patent to the land through which the river runs, and that deeds of conveyance to Piazzek conveyed not only the land on both sides of the river, but the bed of the river as well.

The trial court appears to have adopted defendant's theory, and therefore denied plaintiff damages or compensation.

Piazzek had owned the land on both sides of the river and had

Piazzek v. Drainage District.

maintained the milldam in question for more than sixty years. No objection from any source had ever been made to its operation and maintenance. During all this time the waterpower of the dam had been used to operate a grist mill, for fifty years to operate a grain elevator, for forty years to operate a flour mill, and for a number of years to operate a linseed-oil mill and sawmill, to produce electric power for Valley Falls, for pumping water for the Santa Fe Railway Company, and for other purposes. It was in continual use from the time of its construction until destroyed by the defendant.

The term "public water" is sometimes used in contradistinction to (from) "private waters" to designate navigable waters, the term "private waters" being used to designate nonnavigable waters. (*Lamprey v. State*, 52 Minn. 181, cited in 6 Words & Phrases, Title Public Waters.)

Navigable waters and public waters are synonymous terms. This state claims title to the beds of public streams only. The title to the beds of all other streams is in the riparian owner. The federal government has always patented lands bordering on nonnavigable rivers without regard to the course of such streams.

In *Brewer Oil Co. v. United States*, 260 U. S. 77, 67 Law Ed. 140, it was said:

"A navigable river in this country is one which is used, or is susceptible of being used, in its ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. It does not depend upon the mode by which commerce is conducted upon it, whether by steamers, sailing vessels, or flatboats, nor upon the difficulties attending navigation; but upon the fact whether the river, in its natural state, is such that it affords a channel for useful commerce." (p. 86. See, also, *Oklahoma v. Texas*, 258 U. S. 574, 66 L. Ed. 771, and notes thereunder. Also extensive notes in 42 L. R. A. 162, 1 L. R. A., n. s., 745, 762.)

It is not suggested that the Delaware river has ever been or is now navigable.

The title to beds of nonnavigable rivers is in the riparian owners and not in the state. A riparian owner of land bordering on a nonnavigable stream takes the title to the thread of the stream in fee, free from any burden in favor of the public. (*The People v. Economy Power Company*, 241 Ill. 290.)

The public cannot, in the United States, gain any proprietary right in streams of inland water too small to be used for the transportation of property. (*Wadsworth v. Smith*, 11 Me. 278.)

In *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845, it was said:

"In disposing of public land bordering upon rivers it is not the policy of the government to reserve title to the lands under water, whether the stream be navigable or not. The government parts with its whole title, leaving the question of boundary, whether the shore line or the thread of the stream, to be determined by the local law. In case of navigable waters in this state the boundary is at the bank, and the title to the bed of the stream is in the state." (p. 545.)

If there ever was the slightest doubt as to whether or not the state owned the beds of navigable rivers, and therefore does not own the beds of those nonnavigable, it was settled in *Dana v. Hurst,* 86 Kan. 947, 122 Pac. 1041. It was there considered whether the state owned the bed of the Arkansas river, the largest affluent of the Mississippi except the Missouri—a stream 2,000 miles long and draining an area of 189,000 square miles. Through its long course in Kansas both of its banks were meandered by the government surveyors. It was held that the title to the bed of the river within the boundaries of Kansas is in the state. Other cases pertaining to the subject may be noted: *Kansas v. Colorado,* 206 U. S. 46, 93, 95; *U. S. v. Mackey,* 214 Fed. 137; *Huse v. Glover,* 119 U. S. 543; *Water Power Co. v. Water Commissioners,* 168 U. S. 349; *Hudson Water Co. v. McCaster,* 209 U. S. 349; *Illinois Central Railroad v. Illinois,* 146 U. S. 387, 476.

Referring to the English rule, this court, in *Wood v. Fowler,* 26 Kan. 682, at page 689, said:

"So that really three distinct characters of streams were recognized: First, those smaller streams, which could not be used for any purpose of navigation, in which the title to the soil was in the riparian owner, and along which the public had no rights of highway or otherwise; an intermediate class, in which the riparian owner owned to the middle of the channel, but along whose stream the public had all the rights of a highway; and third that which was called technically the navigable streams, where the title to the bed of the stream was in the sovereign, and all rights were in the public. The same doctrine of riparian ownership to the center of the stream in all rivers unaffected by the ebb and flow of the tide is recognized in some states of the Union; but the better and more generally accepted rule in this country is to apply the term 'navigable' to all the streams which are in fact navigable; and in such case to limit the title of the riparian owner to the bank of the stream. Especially is this true in the states where the lands have been surveyed and patented under the federal law."

"A riparian's right to the use of the flow of the stream passing through or by his land is a right inseparably annexed to the soil, not as an easement or appurtenance, but as a part and parcel of the land; such right being a prop-

erty right, and entitled to protection as such, the same as private property rights generally." (*Crawford Co. v. Hathaway,* 67 Neb. 325, 326.)

The grant by the United States of land containing nonnavigable streams passes title to their beds unless they are expressly reserved from the grant. (*Lux v. Haggin,* 69 Cal. 255.)

*City of Emporia v. Soden,* 25 Kan. 588, was a case wherein Soden had erected and was maintaining a milldam which had cost many thousands of dollars. He had used and maintained it for nineteen years. He owned the land upon which the dam was built and obtained a deed from the upper riparian owner of the right of flowage. The court sustained the injunction of Soden restraining the city from taking water from the pond, no condemnation of the water and no arrangement with Soden having been made. In the opinion it was said:

"Before the city can destroy or diminish the water power of Mr. Soden it must make compensation. We think the statute, under which the city was proceeding, broad enough to include the condemnation of water; so that if the parties cannot agree, proceedings may be had for a condemnation, and in such proceedings plaintiff can recover compensation for such injuries as he is able to prove." (p. 612.)

One who builds and maintains a dam may acquire flowage rights by prescription, and if the dam has been maintained for more than fifteen years a presumption of a grant or of consent by the upper riparian owners arises and gives the owner of the dam a right to its continued maintenance to the extent to which the right had been enjoyed for the period of prescription. (*Wallace v. City of Winfield,* 96 Kan. 35, syl., 149 Pac. 693.) One may acquire the right to erect and maintain a dam by prescription. (40 Cyc. 668, 676; *Whitehair v. Brown,* 80 Kan. 297, 102 Pac. 783.) An owner of land on both sides of a stream may construct therein a dam as an incident to his ownership in the land. (*The People v. Economy Light and Power Co.,* supra.)

Piazzek owned the land on both sides of the Delaware river and owned the bed of the stream, and as an incident to such ownership he had the right to construct the dam in question. Under such circumstances the drainage district was without authority to destroy the dam without compensating him, although, as claimed, it was not constructed under the milldam act then in force.

Another question is the measure of damages, if any, sustained by the plaintiff by reason of the destruction of the milldam and water power.

Plaintiff contends that evidence was admissible to prove the value of the milldam as a power-producing concern; that it was a going concern, and the purposes and objects of its construction should be considered, together with the power produced and the ultimate purpose for which it was constructed.

The trial court, upon objection made to a question propounded to Engineer N. T. Veach, Jr., as to the value of the dam, said:

"The Court: Assuming it is attempting to prove the usable value, the objection is sustained."

"The Court to another witness: You may testify as to the value of the materials in the dam."

The trial court proceeded upon the theory that the dam must be segregated unto itself alone, and that only its value as stone, lumber and mortar while standing in the stream might be shown; that the machinery must be connected with the manufacturing plant and pumping power plant, leaving the dam in the stream and determine what its value would be. This was error.

The milldam was property. It was connected up with the ownership of Piazzek in the lands, with the right to the use of the water —the riparian rights—with the right of flowage. The mill site, the flume way, the water wheels, should all be considered. The dam was constructed to a height sufficient to create, for the greater part of the year, seventy-five horsepower. This power was coupled up and connected with manufacturing plants owned by the plaintiff, also with pumping plants, and had been in constant and continuous use for sixty years. To determine the value of the power it is impossible to separate the power created by the dam from the manufacturing plant. The dam standing alone in the river was worthless. It was of value only when it created power.

On the trial the plaintiff offered to prove the damages sustained, by witnesses who knew Piazzek and his property covering a long period of years. She also offered to prove her damages by civil and hydraulic engineers, some who not only had personal knowledge of the milldam in question, its physical condition and surroundings before its construction, but who were well qualified to give opinions as experts upon the value of the dam and water power. The court refused to permit such witnesses to testify as to such values. The evidence should have been received. It has been said that—

"The proper measure of damages on appeal from condemnation proceedings to remove a milldam is the difference between the value of the mill

property before the removal of the dam and loss of the water power, and its value after the removal has taken place." (*Maynard v. Nemaha Valley Drainage District,* 94 Neb. 610. See, also, *Hubbell v. City of Des Moines,* 183 Ia. 715.)

In *B. & M. R. Co. v. White,* 28 Neb. 116, it was held that where a stone quarry was on the right of way and was destroyed by grading of the road bed it was a source of revenue and had a value as a quarry, and its value was a proper element of damages for consideration by the jury.

"Where a railroad condemned land for a gravel pit, the measure of damages was the full market value of land taken for any and all uses to which it might be put in the light of the present business conditions, and those that might be reasonably expected in the immediate future, together with such damage as the owner might suffer to the remaining portion of his farm by reason of the taking." (*Railway Company v. Mason,* 23 S. D. 564.)

"Where landowners are using their property in lucrative business, in which the locality and its surroundings have some bearing on its value, apart from the money value of the property itself, they are entitled to be compensated so as to lose nothing by the interruption of their business and its damage by the change." (*G. R. & I. R. R. Co. v. Weiden,* 70 Mich. 390.)

The drainage act of 1911 did not delegate to drainage districts the power or authority to take property under the law of eminent domain without compensation. On the contrary, the legislature expressly provided that the drainage district could take property only by condemnation proceedings and by making a just compensation therefor.

The judgment is reversed and the cause remanded for a new trial.