No. 27,335.

J. C. F. WEBB, *Appellee*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF NEOSHO, *Appellant*.

(257 Pac. 966.)

SYLLABUS BY THE COURT.

1. NAVIGABLE WATERS—*What Constitutes—Question of Fact.* Whether or not the Neosho river in Neosho county is a navigable stream is a question of fact to be determined from the evidence.

2. BOUNDARIES — *Meandered Nonnavigable Waters — Ownership to Thread of Stream.* The ownership of land meandered by government survey along a stream not navigable extends to the thread of the stream.

Appeal from Neosho district court; SHELBY C. BROWN, judge. Opinion filed July 9, 1927. Affirmed.

*Hugo T. Wedell*, county attorney, and *R. B. Smith*, of Erie, for the appellant; *C. M. Brobst*, of Chanute, of counsel.

*T. R. Evans*, of Chanute, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff sued to recover for gravel taken from the Neosho river to be used on public roads in Neosho county. Judgment was rendered in favor of the plaintiff, and the defendant appeals.

The cause was tried without a jury, and findings of fact and conclusions of law were made as follows:

---

Boundaries, 9 C. J. p. 187 n. 98; 4 R. C. L. 85, 86. Navigable Waters, 29 Cyc. pp. 289 n. 2, 292 n. 13, 293 n. 24. Waters, 40 Cyc. p. 553 n. 15; 27 R. C. L. 1371.

"The issues submitted to the court in this case pertain to the navigability of the Neosho river. If the court finds under the facts submitted and the law that the Neosho river is a navigable stream then and in that event the judgment and verdict must be in favor of the defendant, otherwise it would be in favor of the plaintiff.

"1. The Neosho river where it passes through or by the lands in litigation in Neosho county, Kansas, is a meandered stream, and the lands were described in the patents, at least part of them, as lots along said river.

"2. In early days there were used on said river at one or more places ferry boats. This was before the county had been supplied with bridges.

"3. The evidence shows that in early days some logs were floated or rafted in parts of the river to a mill or mills located on said stream.

"4. Light boats, some run by motor power, have been used on the river for the transfer of passengers for pleasure and to a very limited extent for hire.

"5. There was evidence introduced showing that at one time while the river was at ordinary height a boat traversed the river from Oswego, Kansas, to Humboldt, Kansas.

"6. In ordinary times, or ordinary stages of the water in the Neosho river, at the points in question light boats could be transferred but could not be transported any great distance up or down the river at such ordinary times without being pushed or helped over the riffles.

"7. The riffles are very shallow, and many of them, in said river as it runs through Neosho county.

"8. The Neosho river has never been used for the transportation of the products of the country along said river in Neosho county, Kansas, such as corn, wheat, oats, hay, cattle, hogs, or other stock.

"9. The Neosho river as a watercourse through Neosho county, has never been susceptible of use for the purpose of commerce and has not possessed a capacity for valuable floatage in the transportation to market of the products of the country through which it runs, and has never been of practical usefulness to the public as a highway in its natural state.

"10. It is admitted by the defendant that quantities of gravel were taken from the lands of the plaintiff, but not in the quantity nor value as alleged by him.

"11. The court finds the amount of gravel taken as follows, and of the value of $568.60 at ten cents per yard.

"Conclusions of Law.

"1. Although the Neosho river is a meandered stream through Neosho county, Kansas, at the points where the gravel was taken from the lands in litigation, yet in its capacity for transportation of passengers, goods, and merchandise not being practicable, the Neosho river is not a navigable stream in fact, and the riparian owners along said stream own the land to the thread or center of the stream.

"2. Judgment will be rendered for the plaintiff in the amount of $568.60, and that the plaintiff recover his costs."

1. The principal question to be determined in this action concerns the navigability of the Neosho river in Neosho county.

In 29 Cyc. 289 it is said:

"Water is navigable in law, although not tidal, where navigable in fact, and is navigable in fact where it is of sufficient capacity to be capable of being used for useful purposes of navigation, that is, for trade and travel in the usual and ordinary modes."

In *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845, this court declared that "the fact that a government surveyor meandered the banks of a·river is evidence that the river was navigable, but is not conclusive of that fact," but that "there is no legal fiction that a stream not navigable in fact is still to be held navigable as a matter of law" (p. 547).

In *Oklahoma v. Texas,* 258 U. S. 574, 586, the supreme court of the United States used the following language:

"Navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, in its natural and ordinary condition as a highway for commerce; over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

2.  Did the plaintiff own the land to the thread of the Neosho river?  In *Kregar v. Fogarty,* 78 Kan. 541, 549, 96 Pac. 845, this court said:

"Under the common law of this state the title of a riparian owner upon unnavigable waters extends to the thread of the stream."

In *Piazzek v. Drainage District,* 119 Kan. 119, 237 Pac. 1059, this court said:

"The terms 'public waters' and 'navigable waters' are ordinarily synonymous. The term 'private waters' is ordinarily used to designate nonnavigable waters. The title to the beds of nonnavigable rivers is in the riparian owners and not in the state." (Syl. ¶ 1.)

In *Railroad Company v. Schurmeir,* 74 U. S. 272, 287, the supreme court of the United States said that "proprietors, bordering on streams not navigable, unless restricted by the terms of their grant, hold to the centre of the stream."   That rule was followed in *Kirby v. Potter,* 138 Cal. 686, 687, and that language was there quoted.

Neither *Kregar v. Fogarty* nor *Piazzek v. Drainage District* conflicts with *Wood v. Fowler,* 26 Kan. 682; *Dana v. Hurst,* 86 Kan. 947, 122 Pac. 1040; *State, ex rel., v. Akers,* 92 Kan, 169, 140 Pac. 637; or *Winters v. Myers,* 92 Kan. 414, 140 Pac. 1033.  What was said in the four last-mentioned cases concerned either the Kansas or Arkansas rivers, both of which were then or had been declared navigable

streams. The meandering of those streams by government survey was considered as evidence to assist in determining whether or not they were navigable. That fact marks the distinction between *Kregar v. Fogarty* and *Piazzek v. Drainage District* and the present action on the one side and *Wood v. Fowler, Dana v. Hurst, State, ex rel., v. Akers,* and *Winter v. Myers,* on the other side. The contest in *Kregar v. Fogarty* involved the title to the bed of the Smoky Hill river near Fort Riley at a place where the river had been meandered in the government survey. The court held that the river was not navigable, and stated that the right of the riparian owner extended to the thread of the stream. The determination of the present controversy is controlled by *Kregar v. Fogarty.*

The judgment is affirmed.

DAWSON, J. (dissenting): I hold that the bed of the Neosho river is public property wherever the federal government or the state of Kansas has not parted with the title thereto. And plaintiff in this action did not, and indeed could not, show title from the state or the United States culminating in himself. The United States surveyors meandered the Neosho river through its entire length in Neosho county and for a short distance further upstream. It has been said that the meandering of a stream is only *prima facie* proof of its navigability. It is also *prima facie* proof that the riparian patentee of the meandered acreage acquired title only to the river bank; and if he claims beyond that boundary line he must produce his title thereto. Plaintiff did not do it; he had none to produce; and the Fogarty case, cited and relied on to support the present judgment, is not controlling. The excerpt quoted from the Fogarty case, that under the common law the title of a riparian owner to unnavigable waters extends to the thread of the stream, is all well enough. Of course that was the common law. But titles in this state are not usually based on the common law. They are based on federal statutes, federal patents, and conveyances made thereunder in conformity with Kansas statutes. This plaintiff did not seek to found his title on the common law. He founded it upon mesne conveyances from prior grantors whose rights were those conferred by government patents describing the lands in terms of government survey and which made express reference to the official plat of the survey of said lands in the general land office, a copy of which is on file in the state land office in charge of the state auditor.

These muniments of title did not profess to convey any part of the bed of the Neosho river. Plaintiff's petition asserted title to certain numbered lots (4, 5 and 3) in section 31, township 29, range 21, *"beginning at an elm tree where north line of said lot three intersects west bank of Neosho river, thence west 3.23 chains to limestone, thence north to Neosho river, thence southeasterly along Neosho river to place of beginning,"* and other lands. Assuming that these lots can be ascertained by examination of the record and plats of the official survey in the state land office (although a painstaking attempt to check these lands therewith completely baffles this writer), it cannot be said that a grant of lands in such terms conveyed the adjacent stream bed of the Neosho river to plaintiff and his grantors. Quite the contrary. Wherever the lands described touch the river the language is the "west bank of the Neosho river," "to the Neosho river," and "along Neosho river to place of beginning." So it is immaterial in this situation what conclusions the trial court reached touching the navigability of the river; plaintiff did not show title to a square foot of that river bed. He owns to the bank of the river—no further.

In the noted case of *Hardin v. Jordan,* 140 U. S. 371, 380, 35 L. Ed. 428, the supreme court said:

"It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary." [Citing many cases.]

In *Wood v. Fowler,* 26 Kan. 682, the effect of meandering the Kansas river was the subject of comment:

"The stream having been meandered, the lines of the surveys are bounded by the bank; the patents from the United States passed title only to the bank; Splitlog, as riparian owner, owned only to the bank. The title to the bed of the stream is in the state. (*Stevens v. Rld. Co.,* 34 N. J. Law, 532; *Pollard's Lessee v. Hagan,* 3 How. U. S. 212.)" (p. 688.)

In *Cushenbery v. Waite-Phillips* Co., 119 Kan. 478, 240 Pac. 400, it was said:

"A surveyor's meandering line along a river bank is not a boundary line of a tract of land; the river bank is itself the boundary line." (Syl. ¶ 2.)

In *Kansas v. Colorado,* 206 U. S. 46, 93, 51 L. Ed. 956, it was said:

" . . . Each state has full jurisdiction over the lands within its borders, including the beds of streams and other waters." (Citing many authorities.)

In *Barney v. Keokuk,* 94 U. S. 324, 24 L. Ed. 224, it was said:

"There seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such [nontidal] waters. It properly belongs to the states by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water." (p. 338.)

In *Hardin v. Jordan,* supra, the supreme court said:

"This right of the states to regulate and control the shores of tidewaters, and the land under them, is the same as that which is exercised by the crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas, and also, in some of the states, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and in Pennsylvania to all the permanent rivers of the state; but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised." (p. 382.)

The foregoing may suffice to demonstrate that if the public has parted with the title to the bed of the Neosho river it is through no fault of the federal government. And it ought to be self-evident that the title to the bed of the stream is still vested in the state of Kansas unless in some duly authorized fashion the state has parted with that title and conferred it upon plaintiff or on some prior riparian owner through whom plaintiff claims. This, it is almost superfluous to assert, the state has never done. (*State, ex rel., v. Akers,* 92 Kan. 169, syl. ¶ 4, 140 Pac. 637.)

On the contrary, the state has affirmatively asserted its unqualified title to all such stream beds as that of the Neosho river, where neither the state nor the United States has conveyed an interest therein to some grantee. (Laws 1913, ch. 259; R. S. 71-101 *et seq.*) Pertinent provisions of this statute, which aside from its regulatory features was merely declaratory of what was the law before its enactment, read:

"71-101. That from and after the taking effect of this act it shall be unlawful for any person, partnership, or corporation to take from within or beneath the bed of any navigable river *or any other river which is the property of the state of Kansas* any sand, oil, gas, gravel or mineral, or any natural product whatsoever from any lands lying in the bed of any such river, or any hay, timber or other products belonging to the state, except in accordance with this act."

"71-106. For the purposes of this act *the bed and channel of any river in this state* or bordering on this state to the middle of the main channel thereof *and all islands and sand bars* lying therein *shall be considered to be the property of the state of Kansas unless this state or the United States has granted or con-*

*veyed an adverse legal or equitable interest therein since January 29, 1861, A. D., or unless there still exists a legal adverse interest therein founded upon a valid grant prior thereto:* Provided, *That nothing in this act shall affect or impair the rights of any riparian landowner or lawful settler upon any island which is state school land."*

It will thus be seen that plaintiff has not shown title in himself; that by meandering the Neosho river and by its general policy the federal government refrained from parting with the title to the bed of the river; that there is an entire want of state legislation conferring upon plaintiff and his grantors the title to this stream bed, and that there is an express legislative assertion of title in the public. Plaintiff is therefore bound to fail, without regard to the question of the navigability of the Neosho river.

And briefly as to navigability: It is a common error to assume that the navigability of a stream is to be determined by its capacity to serve as a highway for modern commerce. Congress had no such notion of navigability when it directed that the surveyor general of the United States should meander all navigable streams. (Act of May 18, 1796, ch. 29, 1 Stat. at L. 465; and supplementary statutes cited in 2 U. S. Comp. Stat. [1901] § 2395.) The sort of navigability of our inland streams contemplated by congress 131 years ago was what the people were accustomed to in that early time. If a stream was used or usable for carrying the primitive commerce of explorers, trappers, hunters, wood cutters and similar pioneers, it was navigable. (*Morgan v. King,* 30 Barb. [N. Y.] 9; *Brown v. Chadbourne,* 31 Me. 9; *Weise v. Smith,* 3 Ore. 445; *Willow River Club v. Wade,* 100 Wis. 86.) See, also, notes in 3 L. K. A. 406; 4 L. R. A. 33; 5 L. R. A. 392; 41 L. R. A. 371.

In *Burroughs v. Whitwam,* 59 Mich. 279, in discussing the navigability of streams as contemplated in the ordinance of 1787 it was said:

"It was intended to and did apply only to such streams as were then common highways for canoes and batteaux in the commerce between the northwestern wilderness and the settled portion of the United States and foreign countries and as to such rivers not then in use as would by law be embraced in the definition of 'navigable waters.'" (Syl. ¶ 3.)

And the fact that portages had to be made over riffles or around rapids did not render the stream nonnavigable (*Broadnax v. Baker,* 94 N. C. 675, syl. ¶ 7; *Matters of Com'rs State Reservation,* 44 N. Y. [37 Hun] 537; *Lysander Spooner v. Alexander McConnell and*

*Others,* [Ohio] 1 McLean 337, 350); and there is ample authority holding that although a stream was only usable for navigation at certain seasons of the year it was considered navigable if such adaptability for use recurred with reasonable regularity. (*Bucki v. Cone,* 25 Fla. 1; *Moore v. Saybourne,* 2 Mich. 519; *Felger v. Robinson,* 3 Ore. 455; *Monroe Mill Co. v. Menzel,* 35 Wash. 487; 102 A. S. R. 905, and note; 29 Cyc. 292; 70 L. R. A. 272 and note.)

In this view of the law and accepting the findings of fact as they stand, the trial court might very well have concluded that the Neosho river was a navigable stream; and the right of Neosho county to take gravel from the stream under authority of R. S. 71-102 necessarily turned on that question. If the trial court had given more generous credence to some of the testimony as to the early use of the river for transportation purposes it would have been bound to find that the Neosho river was not only navigable but had been navigated. And here the point ought to be emphasized that the navigability of a stream is not a simple jury question of fact. This court set aside the jury's findings of fact in *Dana v. Hurst,* 86 *Kan.* 947, 122 Pac. 1041, not because they lacked evidential support, but because the navigability of the Arkansas river was a mixed question of law and fact, where the trial court's findings of fact were not controlling. The present case is not of the sort where this court can discharge its full appellate responsibility by a mere citation of the stereotyped rule that the trial court's judgment based on findings of fact supported by substantial evidence is conclusive. This point is susceptible of demonstration by *reductio ad absurdum.* If such a controversy as the present is determinable from such evidence as the litigants' indolence or zeal may get together for presentation to the trial court in any particular case, then it will probably happen that the Neosho river adjacent to plaintiff's farm will be held to be nonnavigable, and in a similar lawsuit where the quantum of proof adduced by the litigants is different, the same river a mile or two up or down the stream will be declared navigable. Such an absurd situation is bound to happen if the rule of law invoked to decide this lawsuit is followed. It has repeatedly been held that the Kansas and the Arkansas rivers are navigable. (*Wood v. Fowler,* 26 Kan. 682; *Dana v. Hurst,* supra.) How were the facts ascertained in those cases? By testimony of witnesses? Certainly not. The court took judicial notice of the facts, and the

federal supreme court said that was quite a proper exercise of judicial power. (*Wear v. Kansas,* 245 U. S. 154, 62. L. Ed. 214.) And it was quite well that the court did so, especially in the case of the Arkansas river, for if the navigability of that stream had been left to the testimony of witnesses and the findings of the jury, supplemented by a court view of the river itself, the public rights in that stream bed would inevitably have been sacrificed. Touching the Arkansas river, also, scientists have noted that its former volume of water has greatly diminished within living memory. (See J. R. Meade's article, "A Dying River," in volume 14, Transactions of the Kansas Academy of Science, p. 111.) But the title to the stream bed, never having been conveyed to private ownership, remains in the state for the public benefit. (*Dana v. Hurst,* supra.)

Some courts have come to realize that the debatable fact of navigability is a very unsatisfactory determinant of the title to the bed of a stream. In Thompson's Title to Real Property, 127 (Bobbs-Merrill, 1919), it is said:

"A division of waters into public and private waters has been adopted in some recent decisions, and undoubtedly the tendency is to extend and assert public rights against private ownership in lakes and rivers, without much regard to any test or definition of navigability."

And since navigation of public streams in Kansas is virtually nonexistent, the further away we get from the times and customs of the historic voyageurs, explorers and trappers, and their primitive water-borne commerce,. the sooner this court abandons all discussion of navigability as a test of title to Kansas river beds the better. The test of navigability is merely an academic stumbling block which needs be gotten rid of. Let us use the more accurate terms of public streams and private streams. If a riparian owner can show title deraigned from the United States or the state of Kansas, the stream bed is his private property. (*Piazzek v. Drainage District,* 119 Kan. 119, 237 Pac. 1059.) If he cannot—if it cannot be shown that the federal or state government has parted with the title thereto —the stream is a public stream and the bed of that stream is public property.

Let it be understood that ordinarily the terms "public stream" and "navigable stream" are interchangeable terms. I advocate no change in substantive law. I merely urge the adoption of a more precise and less misleading terminology. Let us say that where the

title to a stream bed has never been conveyed by the state or federal government this court prefers to designate it as a public stream rather than as a navigable stream, so that every time a question arises touching the title of a Kansas stream bed it will not be necessary to open a judicial kindergarten to teach the history and geography of the American wilderness and the pertinent statutory and other changes in the common law of inland waterways and riparian rights which the new conditions of the wilderness required.

To the suggestion that private property rights might be affected by such a pronouncement, I reply that no matter what may have been said in private litigation touching the extent of ownership vested in the riparian owners of meandered streams, the public right therein was never a major issue in any such lawsuit; and certainly the public right could not be foreclosed in any litigation to which the state's responsible representatives were not a party. The Fogarty decision is no obstacle to the solution I suggest. There the question was whether the state's grantee of the right to build a dam might rebuild it after its destruction. That right was properly upheld. And of course, wherever a riparian owner can show a valid grant from the state to a stream bed, an island, a sand bar, or the right to bridge or dam a public stream, his property rights will be protected.

Every important consideration constrains to the conclusion I suggest. But for the important public interests affected by this decision I would simply ask that my dissent be noted without comment. I pass by the matter of the state's interest in minerals in the beds of public streams which are bound to be affected by the present decision, although the public revenues to be anticipated therefrom are bound to be considerable and are of growing importance in this age of high taxes. The Neosho river is not only a public stream by the test of public retention of title to its stream bed, but because it is a chronic public problem as well. We know judicially that on five separate occasions within the past year it has been a raging torrent, one to three miles wide, dealing death and destruction along its course. Certainly that situation will not continue to be tolerated; and when the statesman and the civil engineer get ready to curb this turbulent waterway I would not add to their perplexities by a judicial declaration that the Neosho river is not a public stream, with the consequence that the state and federal governments must

pay tribute to the riparian owners for leave to clear it of obstructions, dike it, or otherwise control it as modern engineering science may suggest. My objections to this decision are not submitted as an exhaustive treatment of this important subject. Press of other tasks would not permit its more thorough preparation. It will serve, however, to show why I decline to share in the responsibility for the judgment the court is about to pronounce.

HARVEY and HOPKINS, JJ., concur in this dissent.