No. 63,145

STATE OF KANSAS, *ex rel.*, CHRISTOPHER YOUNG MEEK, *Appellant,*
v. JASPER R. HAYS and MRS. JASPER R. HAYS, *Appellees.*

(785 P.2d 1356)

Opinion
filed January 19, 1990.

*Christopher Young Meek,* county attorney, argued the cause, and *Oliver Kent Lynch,* assistant county attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellant.

*J. Scott Thompson,* of Pittsburg, argued the cause, and *Edward W. Dosh,* of Parsons, was with him on the brief for appellees.

*Frank L. Austenfeld*, of Mission, was on the brief for *amici curiae* Kansas Wildlife Federation and Geary County Fish and Game Association.

*Michael D. Gibbens*, of Kansas City, was on the brief for *amicus curiae* Kansas Canoe Association.

*Alan F. Alderson*, of Alderson, Alderson & Montgomery, of Topeka, was on the brief for *amicus curiae* Kansas Livestock Association.

*Charles S. Arthur*, of Manhattan, was on the brief for *amicus curiae* Kansas Farm Bureau.

The opinion of the court was delivered by

LOCKETT, J.: Jasper R. Hays constructed a fence across Shoal Creek, in part to prevent canoeists and others from using that portion of the stream which flows through his land located in southeast Cherokee County. Christopher Y. Meek, the Cherokee County Attorney, filed a petition for declaratory judgment seeking to confirm the public's right to use Shoal Creek for recreational purposes. On June 11, 1988, the district court ordered Hays to remove the fence pending a hearing on the State's petition. On September 22, the district court denied the State's petition and dissolved its temporary restraining order, concluding:

"1. Shoal Creek is not susceptible of being used in its natural and ordinary condition as a highway for commerce and does not possess a capacity for valuable floatage in transportation to market of the products of the country through which it passes; it is therefore a nonnavigable stream.

"2. Respondents hold title to the stream bed of Shoal Creek where it passes through their property, and may exercise the same authority and control over the stream, its banks and bed, as the property adjacent to the stream, including the right to erect a barricade, barrier, or fence across the stream."

The State appeals, claiming that (1) Shoal Creek is a navigable stream; (2) the public has acquired the right to use Shoal Creek by prescriptive easement; and (3) the public has the right to use Shoal Creek under the public trust doctrine. In addition to the parties, the following *amici curiae* have briefed the case: The Kansas Wildlife Federation, the Geary County Fish and Game Association, and the Kansas Canoe Association support the State's position; and the Kansas Farm Bureau and the Kansas Livestock Association support the Hays' position.

## Navigability

If Shoal Creek is a navigable stream, the Hays' ownership

extends only to the banks. *Siler v. Dreyer*, 183 Kan. 419, 421, 327 P.2d 1031 (1958). If the stream is nonnavigable, the Hays own the bed of the stream by the same title that they own the adjoining land. *Dougan v. Shawnee County Comm'rs*, 141 Kan. 554, Syl. ¶ 3, 43 P.2d 223 (1935). If the stream is nonnavigable, the Hays, who own the land adjoining both sides of the stream, may put a fence across the stream to prevent trespassers upon their property. See Att'y Gen. Op. No. 74-137.

In England, streams were considered navigable only in so far as they partook of the sea, and to the extent that their waters were affected by the ebb and flow of the tide, and only so far was the title of the riparian owner limited to the bank; above such point, even though the stream was large enough to be used, and in fact was used, for purposes of navigation, the riparian owner owned the soil *ad medium filum aquae*—to the middle thread of the stream. There were three distinct characters of streams recognized: First, those smaller streams, which could not be used for any purpose of navigation, in which the title to the soil was in the riparian owner, and along which the public had no rights of highway or otherwise; second, an intermediate class, in which the riparian owner owned to the middle of the channel, but along whose stream the public had all the rights of a highway; and third, that which was called technically the navigable streams, where the title to the bed of the stream was in the sovereign, and all rights were in the public. The same doctrine of riparian ownership to the center of the stream in rivers unaffected by the ebb and flow of the tide is recognized in some states of the Union; but the better and more generally accepted rule in this country is to apply the term "navigable" to all the streams which are in fact navigable; and in such case to limit the title of the riparian owner to the bank of the stream. This is true in Kansas and most states where the lands have been surveyed and patented under the federal law. *Wood v. Fowler*, 26 Kan. 682, 689 (1882).

To determine navigability, the first question is whether title to the riverbed passed to the State upon admittance into the Union. The critical case on this point is *United States v. Holt Bank*, 270 U.S. 49, 70 L. Ed. 465, 46 S. Ct. 197 (1926), which established that ownership of the beds of navigable streams and lakes is a federal question to be resolved according to principles

of federal law and under federal definitions. *Holt Bank* also established the specific criteria to be used in determining whether particular bodies of water are deemed navigable for purposes of vesting the state with title to the beds. Under this test, bodies of water are navigable and title to the beds under the water are vested in the state if: (1) the bodies of water were used, or were susceptible of being used, as a matter of fact, as highways for commerce; (2) such use for commerce was possible under the natural conditions of the body of water; (3) commerce was or could have been conducted in the customary modes of trade or travel on water; and (4) all of these conditions were satisfied at the time of statehood. 270 U.S. at 55-56.

The last navigability case to come before this court was *Webb v. Neosho County Comm'rs*, 124 Kan. 38, 257 Pac. 966 (1927). There, the landowner sued the Neosho County Commissioners to recover for gravel taken from the Neosho River and used on the public roads in Neosho County. The *Webb* court found the Neosho River was not navigable by applying the following test:

" 'Navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, in its natural and ordinary condition as a highway of commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.' " 124 Kan. at 40 (quoting *Oklahoma v. Texas*, 258 U.S. 574, 586, 66 L. Ed. 771, 42 S. Ct. 406 [1922]).

As Professor Wadley notes, this definition "appears to track the [*Holt Bank*] federal title test in all relevant areas except for the requirement that the criteria be satisfied as of the time of statehood." Wadley, *Recreational Use of Nonnavigable Waterways*, 56 J.K.B.A. 27, 31 (Nov./Dec. 1987).

In its analysis, the *Webb* court first stated that navigability "is a question of fact to be determined from the evidence." 124 Kan. 38, Syl. 1. It then considered the trial court's factual findings:

" '2. In early days there were used on said river at one or more places ferry boats. This was before the county had been supplied with bridges.
" '3. The evidence shows that in early days some logs were floated or rafted in parts of the river to a mill or mills located on said stream.

" '4. Light boats, some run by motor power, have been used on the river for the transfer of passengers for pleasure and to a very limited extent for hire.

" '5. There was evidence introduced showing that at one time while the river was at ordinary height a boat traversed the river from Oswego, Kansas, to Humboldt, Kansas [a straight-line distance of approximately 50 miles].

" '6. In ordinary times, or ordinary stages of the water in the Neosho river, at the points in question light boats could be transferred but could not be transported any great distance up or down the river at such ordinary times without being pushed or helped over the riffles.

" '7. The riffles are very shallow, and many of them [are] in said river as it runs through Neosho county.

" '8. The Neosho river has never been used for the transportation of the products of the country along said river in Neosho county, Kansas, such as corn, wheat, oats, hay, cattle, hogs, or other stock.' " 124 Kan. at 39.

Based on this evidence, the *Webb* court found the Neosho River to be nonnavigable. 124 Kan. at 41.

Only three rivers within the state have been declared navigable: the Kansas, the Arkansas, and the Missouri. See *State, ex rel. v. Akers*, 92 Kan. 169, 140 Pac. 637 (1914); *Dana v. Hurst*, 86 Kan. 947, 964, 122 Pac. 1041 (1912); and *Wood v. Fowler*, 26 Kan. 682. Likewise, only three rivers have been declared non-navigable: the Neosho, the Delaware, and the Smoky Hill. See *Webb v. Neosho County Comm'rs*, 124 Kan. 38; *Piazzek v. Drainage District*, 119 Kan. 119, Syl. ¶ 2, 237 Pac. 1059 (1925); and *Kregar v. Fogarty*, 78 Kan. 541, Syl. ¶ 3, 96 Pac. 845 (1908).

Did title to the Shoal Creek stream bed pass to the State upon entry into the Union or is there sufficient evidence to declare Shoal Creek navigable? The trial court made these findings of fact:

"(10) Shoal Creek cannot be floated without getting out of the canoe or boat at various locations.

"(11) John Link, Jr., owner of Ozark Quality Products, Inc., travels Shoal Creek several times a year collecting plants used in his business . . . .

"(12) There is no evidence that Shoal Creek has ever been used for valuable floatage in transportation to market of the products of the country through which it runs.

"(13) During times of drouth, portions of Shoal Creek are impassable by even a canoe or small boat . . . .

"(14) Shoal Creek has been used for recreational purposes for more than fifteen years.

"(15) A canoe rental business exists, known as Holly Haven, which rents canoes to be used on Shoal Creek. The point of entry is near Joplin,

Missouri, with the point of exit at Schermerhorn Park, Galena, Kansas, where the business picks up the canoes and their occupants for the return trip to Holly Haven."

Based on these findings, the district court held that Shoal Creek did not meet the *Webb* standard for navigability.

The State does not challenge the trial court's findings; rather, it argues that findings (11) and (15) indicate that the stream is susceptible of being used for commerce, thus meeting the *Webb* standard for navigability. The Kansas Wildlife Federation adds: "Because Shoal Creek is in the same natural condition as it was at the time of statehood, any commercial use of the river today conclusively demonstrates that the river was 'susceptible of use' at the time Kansas was admitted to the Union."

Based on the trial court's finding of facts, Shoal Creek is less "navigable" than the Neosho River. Under both the federal (*Holt Bank*) and current state (*Webb*) tests for navigability, title to the Shoal Creek stream bed did not pass to the State upon entry into the Union.

Though federal and state laws set the criteria to determine the issue of navigability for purposes of determining state title, individual states are relatively free to regulate the consumptive and nonconsumptive *use* of water within their borders. State regulatory concerns may depart from state ownership of the beds of navigable bodies of water as the primary criterion by which public need or access to water is secured.

Based on the public's increasing desire to use water for nonconsumptive recreational purposes, the State urges us to adopt a "modern" view of navigability which would not affect landowners' title to the riverbeds. Other states have taken such action.

A 1959 Wyoming statute allowed persons and their property to float by boat, canoe, or raft on any stream in the state that had an average flow of water exceeding 1000 cubic feet per second during the month of July. The law prohibited landowners from obstructing the stream and persons who float on the stream from going on the landowners' property without permission. This statute was repealed in 1963. In *Day v. Armstrong*, 362 P.2d 137, 145-46 (Wyo. 1961), the court determined that, under the Wyoming Constitution, title to the water is in the State. Neither the Wyoming Constitution nor the act of Congress admitting the

state into the Union limited the kind or type of use the State may make of its waters. Therefore, the legislature had the power to allow persons to float on the streams. In addition, the court determined that the public, while floating on the state's waters, may hunt, fish, or do anything which is not otherwise made unlawful.

In *People v. Mack*, 19 Cal. App. 3d 1040, 1045-46, 97 Cal. Rptr. 448 (1971), the California court recognized that under the prior California law, a stream is navigable if it is susceptible to the useful commercial purpose of carrying the products of the country (citing *Wright v. Seymour*, 69 Cal. 122, 10 Pac. 323 [1886]) or when declared navigable by the legislature. A navigable stream may be used by the public for boating, swimming, fishing, hunting, and all recreational purposes. The court then discussed the modern tendency of several other states to allow the public to use any stream capable of being used for recreational purposes. It then determined that a stream that can be boated or sailed for pleasure is also navigable.

In *Southern Idaho F. & G. Ass'n v. Picabo Livestock, Inc.*, 96 Idaho 360, 362-63, 528 P.2d 1295 (1974), the Idaho court found that, while the federal test of navigability determines the title to stream beds, as the present action did not involve title to the bed of a navigable stream, the federal test of navigability does not preclude a less restrictive state test of navigability. It upheld the legislature's enactment that any stream which, in its natural state, will float logs or any other commercial or floatable commodity, or is capable of being navigated by oar or motor propelled small craft, for pleasure or commercial purposes, is navigable. The Idaho court concluded that, where a stream is navigable, the public's right to use the stream for fishing extended to boating, swimming, hunting, and all recreational purposes.

In *State v. McIlroy*, 268 Ark. 227, Syl. ¶ 6, 595 S.W.2d 659, *cert. denied* 449 U.S. 843 (1980), landowners along the Mulberry River brought suit because their privacy was being interrupted by people trespassing on their property, littering the stream, and generally destroying their property. The Arkansas Supreme Court, after recognizing that the criterion for determining the navigability of a stream depended upon the usefulness of the stream for carrying out farm and forest products and bringing in

merchandise during some seasons of the year, expanded navigability to include the use of streams for recreational purposes, such as fishing in flatbottomed boats, canoeing, or floating.

The Arkansas court recognized that the landowners have a right to prohibit the public from crossing their property to reach the stream. In addition, the state government has a duty to protect the landowners' rights and the responsibility to keep navigable waters in their natural and unblemished state.

The Hays claim the adoption of a "modern" test for navigability by this court would be a radical change in current state law, citing *People v. Emmert*, 198 Colo. 137, 597 P.2d 1025 (1979), where the Colorado Supreme Court held that the defendants did not have any right under the state constitution to float on nonnavigable streams within boundaries of privately owned property without the consent of the property owner. In that case, Emmert and two others were convicted of criminal trespass after they rafted down a nonnavigable stream without first obtaining the riparian landowner's permission. They challenged the convictions, claiming a right to use the stream under the following state constitutional provision:

"The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." Colo. Const. art. XVI, § 5.

In affirming the convictions, the Colorado Supreme Court held that this provision, which appeared under a section entitled "Irrigation," did not open state waters for public recreational use. The court found support for this interpretation in state statutes which: (1) codified the common-law rule of *cujus est solum, ejus est usque ad coelum*—he who owns the surface of the ground has the exclusive right to everything which is above it; (2) authorized the State Wildlife Commission to contract for public hunting and fishing on private land; and (3) made unauthorized entry upon private land a crime.

The Colorado court in *Emmert* concisely summarized the Hays' position: " 'If a change in long established judicial precedent is desirable, it is a legislative and not a judicial function to make any needed change.' " 198 Colo. at 141. Our legislature's current

view on the recreational use of water is discussed with the last issue.

Prescriptive Easement

The State also claims that the public has acquired the right to use Shoal Creek by prescriptive easement. Though we have never determined whether an individual can acquire a prescriptive easement to use the nonnavigable waterways of this state, in *State, ex rel., Akers*, 92 Kan. 169, Syl. ¶ 4, we found that title to the waters or bed of a navigable stream cannot be acquired through private use or occupancy, whether adverse or by permission, however long continued, or by prescription.

By analogy, the requirements for an overland highway easement are set out in *Shanks v. Robertson*, 101 Kan. 463, 465, 168 Pac. 316 (1917):

" 'To establish a highway by prescription the land in question must have been used by the public with the actual or implied knowledge of the landowner, adversely under claim or color of right, and not merely by the owner's permission, and continuously and uninterruptedly, for the period required to bar an action for the recovery of possession of land or otherwise prescribed by statute. When these conditions are present a highway exists by prescription; otherwise not.' "

The period required to bar an action for the recovery of possession of land is 15 years. K.S.A. 60-503. There is evidence that the public had used Shoal Creek for pleasure boating for more than 15 years.

In *Kratina v. Board of Commissioners*, 219 Kan. 499, Syl. ¶ 3, 548 P.2d 1232 (1976), we modified the *Shanks* test by adding the following requirement when a prescriptive easement is to be obtained by the public at large: "Mere use by the traveling public is not enough to establish . . . that the use is adverse . . . . There must in addition be some action, formal or informal, by the public authorities indicating their intention to treat the road as a public one."

The Kansas Wildlife Federation claims the *Kratina* requirement is inapplicable because the stream in its natural condition needs no maintenance. For authority, the Kansas Wildlife Federation cites *Buffalo River Conservation v. National Park*, 558 F.2d 1342 (8th Cir. 1977), *cert. denied* 435 U.S. 924 (1978). There, riparian landowners sued the federal government to halt the creation of

a national park along the Buffalo River. In affirming the district court's judgment against the landowners, the Court of Appeals noted that canoeists had floated the Buffalo River for many years. This flotation had been open and ever-increasing in intensity, and open and adverse for more than the seven years required by Arkansas law for the establishment of a prescriptive public easement over the course of the stream and its bed. The Eighth Circuit went on to say: "While the cases cited deal with prescriptive rights-of-way over land, we agree with the trial court that they apply by analogy to rights-of-way over non-navigable streams and their beds." 558 F.2d at 1345.

The Hays argue that the *Buffalo River* case is of no precedential value because the Arkansas courts have imposed no *Kratina*-type requirement for official public action. They cite *Kempf v. Ellixson*, 69 Mich. App. 339, 244 N.W.2d 476 (1976), wherein littoral landowners brought suit contesting the public use of a lake. The Michigan court found that, unless there has been some action by representatives of the public, *i.e.*, the government, a public easement cannot be established by prescription. The court went on to say that recreational use of an area by various individuals over a period of years is insufficient to establish a public easement. Neither occasional use by a large number of bathers nor frequent or even constant use by a smaller number of bathers gives rise to a prescriptive right in the public to use privately owned beaches. It is only when the use during the prescribed period is so multitudinous that the facilities of local governmental agencies must be put into play to regulate traffic, keep the peace, and invoke sanitary measures that it can be said that the public has acquired a prescriptive right to use privately owned beaches. The court determined that to establish public recreation rights by prescription requires at a minimum governmental action to facilitate and control recreational use and remanded the case for a determination as to whether prescriptive easements had been established. 69 Mich. App. at 343-44.

We agree that the doctrine of prescriptive easement for public highways extends to streams and rivers of this state. For the public to obtain a prescriptive easement for recreational travel, both the *Shanks* test and *Kratina* requirement for official public action are required. Neither occasional use of the creek by a large

number of canoeists nor frequent use by a small number of canoeists gives rise to a prescriptive right in the public to use nonnavigable streams. A public prescriptive right arises during the prescribed period when public use becomes so burdensome that government must regulate traffic, keep the peace, invoke sanitary measures, and insure that the natural condition of the stream is maintained. Because public officials have taken no such action, there is no public prescriptive easement on Shoal Creek.

## The Public Trust Doctrine

The State finally contends that the public is entitled to use Shoal Creek under the public trust doctrine. The essence of the public trust doctrine was articulated by Professor Sax: "When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism on *any* government conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties." Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 473, 490 (1970). See *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 36 L. Ed. 1018, 13 S. Ct. 110 (1892).

Citing *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 98 L. Ed. 2d 877, 108 S. Ct. 791 (1988), the Kansas Wildlife Federation points out that a state may extend the public trust doctrine to nonnavigable waters. In *Phillips*, the Court affirmed a decision by the Mississippi Supreme Court validating oil and gas leases the State had granted over certain nonnavigable streams and a bayou. The land underlying these waters was privately owned. Since the streams and bayou were influenced by tides running from the Gulf of Mexico, the Court found that title to the underlying land had passed to Mississippi upon its entry into the Union. Although the discussion in *Phillips* centered on coastal water rights, the Court acknowledged: "[I]t has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." 484 U.S. at 475.

At least one state, Montana, has applied the public trust doctrine under facts similar to those presented by this case. The Montana Supreme Court determined that, under the public trust

doctrine and the 1972 Montana Constitution, "any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability." *Montana Coalition for Stream Access v. Curran*, 210 Mont. 38, 53, 682 P.2d 163 (1984). The constitutional provision to which the Montana court referred, Mont. Const. art. IX, § 3, provides: "All surface, underground, flood and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and subject to appropriation for beneficial uses as provided by law."

The State analogizes the Montana constitutional provision with K.S.A. 82a-702, which provides:

"**Dedication of use of water.** All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed."

While the broad language in 82a-702 is similar to that which appears in the Montana Constitution and others, it is clear that our legislature did not intend to incorporate the State's position when it passed that statute. A thorough discussion of the history behind 82a-702 and related statutes appears in *Williams v. City of Wichita*, 190 Kan. 317, 331-36, 374 P.2d 578 (1962). Here, it is sufficient to note that these statutes were intended to address problems related to the consumptive use of water, and not non-consumptive, recreational use. Statutory provisions concerned with consumptive appropriation cannot be applied to subvert a riparian landowner's right to exclusive surface use of waters bounded by his land.

Further evidence of our legislature's disinclination toward the State's position can be seen in the treatment of three bills introduced during the 1986 and 1987 legislative sessions. House Bill 2835, which was introduced in 1986, sought to amend K.S.A. 82a-702 by adding the following language:

"All water of the state which can serve a beneficial purpose is hereby declared to be public waters, and the public shall have a right to make a nonconsumptive use of such water without obtaining an appropriation. The public character of the water shall not be determined exclusively by the proprietorship of the underlying, overlying or surrounding land or on whether it is a body or stream of water which was navigable in fact or

susceptible of being used as a highway for commerce at the time this state was admitted to the union."

This bill was killed in the House Energy and Natural Resources Committee on February 27, 1986.

House Bill 3038 was also introduced during the 1986 session. Known as the Kansas Recreational River Act, this bill would have allowed the legislature to designate "selected rivers within this state [which possess] outstanding fish and wildlife, recreational, geologic or scenic values" as recreational rivers. This designation would have allowed the public "to enjoy and use such rivers through noncontact river recreation." Noncontact river recreation was defined as "the public use of a recreational river by means of a vessel." This bill died in the House Energy and Natural Resources Committee without action.

House Bill 3038 was resurrected in 1987 as Senate Bill 94 and was killed by the Senate Energy and Natural Resources Committee on February 6, 1987.

Owners of the bed of a nonnavigable stream have the exclusive right of control of everything above the stream bed, subject only to constitutional and statutory limitations, restrictions, and regulations. Where the legislature refuses to create a public trust for recreational purposes in nonnavigable streams, courts should not alter the legislature's statement of public policy by judicial legislation. If the nonnavigable waters of this state are to be appropriated for recreational use, the legislative process is the proper method to achieve this goal.

The public has no right to the use of nonnavigable water overlying private lands for recreational purposes without the consent of the landowner.

Affirmed.