THE CITY OF TOPEKA V. JOHN Q. COWEE.

1. STREET—*User*—*Title.* User, to create a title by prescription to a public street, must be under a claim of right by the public, adverse to the right of the owner, and continued without substantial interruption or change for a period equal to the statutory limitation in respect to actions for the recovery of real estate.

2. ———— *No Prescriptive Right.* The findings examined, and *held,* that they show no prescriptive right in the city to the land in controversy as a part of its streets.

3. ———— *No Dedication.* Also, *held,* that there is nothing in the findings sufficient to justify the conclusion that the land in controversy was ever, in any way, dedicated to the city by C. for a street.

*Error from Shawnee Circuit Court.*

EJECTMENT by *Cowee* against the *City.* Judgment for plaintiff July 21, 1891. The defendant comes to this court. The opinion states the case.

*S. B. Isenhart,* city attorney, for plaintiff in error; *J. G. Slonecker,* of counsel.

*J. G. Waters,* and *E. F. Hilton,* for defendant in error.

Opinion by STRANG, C.: Action in ejectment, for the recovery of the possession of a tract of land 80 feet by 225 feet, part of a larger tract fully described in the petition in the case. The case was tried by the circuit court of Shawnee county, resulting in a judgment for the plaintiff below. Motion for a new trial was heard and overruled. The court below made the following findings of fact:

"1. The plaintiff became the owner of part of the land in controversy on June 8, 1868, and the remainder on May 5, 1871.

"2. Taxes have been assessed on the entire tract of land belonging to the plaintiff by its description, as a tract 224 feet by 225 feet, every year since then, and these taxes have all been paid by the plaintiff, and which included the tract in controversy.

"3. The land in controversy has never at any time been

platted or laid off into blocks, lots, streets or alleys by the owner or proprietor thereof, nor has any owner or proprietor at any time ever consented to such plat or laying-off of such land.

"4. The land in controversy is level-lying land, as is also that adjacent to it. Prior to the bringing of this action, said land was never cultivated or inclosed, nor was it at any time occupied or improved by the plaintiff in any manner.

"5. There has been a traveled way or road over the land in controversy ever since 1869, which was started as random road, over which, since then, there has been travel, increasing in amount with the increase in population. At the time such road was started, it was the habit and custom of the people in the vicinity of the land in controversy to make roads over such lands, situated as this land is, for and at their convenience, across lots, diagonally over lots and blocks, changing the course of roads as the country became fenced, and it was in this manner that the road was started over the land in question. The width of such traveled road over the land in question was not more than 20 feet.

"6. The city of Topeka is a city and municipal corporation of the first class, and has been such ever since the year 1881, prior to which time it was a city of the second class, and situated in the county of Shawnee.

"7. In July, 1869, one Zenas King made and filed a plat of what he called 'King's Addition to the City of Topeka,' which included all the land of plaintiff described in the petition, and the land in controversy, and in and by which plat the said land of plaintiff was laid off into blocks, lots, streets, and alleys, and that particular portion being the land in controversy was platted by King as Twelfth street. King, in the explanation to said plat, declares that the same was not to be construed against the rights of any person or persons claiming the whole or any part of such portion of said additions as are contained within the bounds of the red dotted lines exhibited thereon, or as against the right-of-way of any public highway; that within such dotted lines was the entire land of plaintiff as described in his petition.

"8. Thereafter, on February 28, 1871, April 15, 1875, and February 25, 1882, the city of Topeka passed and published three certain ordinances, annexing and taking into the city of Topeka the said King's addition; and under these ordinances it was claimed and asserted by the city that the land of plain-

tiff was annexed, taken into and made a part of the city of Topeka; that, other than these three ordinances, no other ordinances were had, taken or made to take into the said city and annex as a part thereof any of the lands of plaintiff described in petition.

"9. In 1879 the city of Topeka graded the land in controversy as a street, putting ditches along the sides, and in the same year constructed a stone cross-walk along the west side of Western avenue, crossing Twelfth street, and one on the north line of Twelfth street, crossing Western avenue, and ever since that time said city has maintained said cross-walks.

"10. March 6, 1882, the petition of 31 persons was presented to the city council of the city of Topeka, asking for the opening of Western avenue between Tenth avenue and Twelfth street. This petition was referred to the committee on streets and walks, and on March 13, 1882, the committee reported that the owners of all the property affected by the street named being closed purchased with a knowledge that James Brewer's house stood in the middle of the street as laid out, and paid price accordingly; and, in the opinion of said committee, it is not doing justice to the tax-payers of the city to levy a general tax for the benefit of the few, and we would recommend that the city pay the sum of $500, provided the interested parties raise the balance, which report, on March 13, 1882, was adopted."

"12. In the year 1882 the city of Topeka duly passed an ordinance vacating five feet on the north side of Twelfth street, from Western avenue to West street, which West street lies several streets west of Fillmore street.

"13. On January 8, 1883, Sarah Caldwell and others presented the following petition to the mayor and councilmen of defendant: 'The undersigned would respectfully represent to your honorable body that they are freeholders of said city, owning lots on the east side of Fillmore street, between Eleventh and Twelfth streets, in said city of Topeka, Kas.; that they were induced, amongst other reasons, to buy said lots and make their homes thereon by the fact that King's addition to the city of Topeka, on file in the office of the register of deeds of Shawnee county, Kansas, shows an alley in the rear of said lots; that said alley has never been opened, but, on the contrary, is now fenced up by one John Armstrong, who claims to own the ground thus shown and marked on said plat as an alley; that these petitioners,

by the fencing up of said alley, are greatly annoyed and hindered in the enjoyment and use of their property, said city lots on the east side of Fillmore street, between Eleventh and Twelfth streets, in said city of Topeka, Kas, by them purchased according to the plat above mentioned. Wherefore, your petitioners humbly request and petition your honorable body to take at the earliest possible moment the necessary steps to have the alley in the rear of said lots above mentioned opened up'— which petition was referred to a committee of three councilmen; that on February 9, 1883, the committee submitted their report, recommending that a committee of three property-owners, not connected with the council, be appointed to confer with the parties to whom the property belongs, and ascertain the cost to the city of opening said streets without consideration on the part of the city, and report at an early date; that such committee of property owners was duly appointed; that on August 13, 1883, the special committee of property-owners above mentioned submitted their report in writing to the council, which report was read and ordered filed, and is as follows:

" ' *To the Honorable Mayor and Councilmen of the City of Topeka :*

"'The undersigned appraisers, duly appointed by your honorable body on June 4, 1883, for the purpose of assessing the value and damages of land to be appropriated for the use of the city of Topeka for streets and avenues, and more fully described in ordinance No. 484, approved May 22, 1883, a copy of which is hereto attached, marked 'Exhibit A,' respectfully submit their report:

"'On the 12th day of June, 1883, the undersigned appraisers took and subscribed respectively the oath of office, which oath is hereto attached and marked 'Exhibit B.' On the 13th day of June, 1883, we served written notice as required by law to James Brewer, John Armstrong, F. W. Giles, and J. Q. Cowee, owners of the several parcels of land to be appropriated by said city as aforesaid. Said board of appraisers met on June 25, 1883, at the hour of 2 o'clock P. M., on the premises described in the ordinance hereinbefore mentioned, and assessed the value of damages of the several pieces of ground, and after careful investigation of the title in and to the several premises set aside said first appraisement. Thereupon, on the 18th of August, 1883, said board of appraisers caused a new notice to be issued and served upon James Brewer, F. W. Giles, John Armstrong, and J. Q. Cowee, the three former persons residing in the city of Topeka, and J. Q. Cowee residing at Grand Haven, Osage county, Kansas. On the 23d day of August, 1883, at 2 o'clock P. M., the undersigned appraisers met at the place described in the ordinance hereinbefore mentioned, and upon actual view assessed the value and damages of the several parcels of land to be appropriated for the use of the city of Topeka for streets and avenues, as follows : To James Brewer, damages for opening King street and Western avenue, $2,400; to F. W. Giles, damages for opening Western avenue, $56; to John Armstrong, damages for opening Western avenue, $150; to J. Q. Cowee, damages for opening Western avenue, $350. The location and also number of feet to be appropri-

ated off of the several pieces of grounds are shown upon the plat
marked 'C' and made a part of this report.

"'We submit also to your consideration the following: Mr. J. Q.
Cowee will deed to the city of Topeka so much of his land as is neces-
sary for the opening of Western avenue and Twelfth street for the sum
of $650, and we would recommend to your honorable body the pur-
chase at that price, it being in our judgment necessary that Twelfth
street be opened to the public, and we deem the price reasonable.  All
of which is respectfully submitted.        J. N. Strickler,
                                          T. L. Stringham,
                                          S. Gunther,
                                              *Board of Appraisers.*'

"The persons comprising the above board of appraisers were
the committee of three property-owners before mentioned, and
which report was approved by the mayor and councilmen of
defendant.

"14. The first formal steps taken by the mayor and coun-
cilmen of defendant to open Twelfth street, to the east and to
the west of the land in controversy, was in 1883.

"15. In the year 1884 the city of Topeka built a sidewalk
on the western line of Western avenue, over that part of the
land of plaintiff as described in the petition, and extending
from the north line of plaintiff's property to the north side
of Twelfth street, which was charged on the tax-roll of Shaw-
nee county against the entire tract described in the petition of
the plaintiff, and which plaintiff paid.

"16. In the year 1889, and after the commencement of
this suit, the city of Topeka built a sidewalk on the north line
of the land in controversy, and which was charged on the tax-
rolls of Shawnee county against the entire tract of plaintiff
described in his petition.

"17. In April, 1889, the city of Topeka, by ordinance, au-
thorized the Topeka Rapid Transit Railway Company to lay
down its track in, and operate its line of street railway along
and over Twelfth street, and that year, immediately thereafter,
said railway company laid down its tracks in Twelfth street
and over the land in controversy, and ever since then has
operated its line of railway along and over the same.

"18. The plaintiff is a farmer, living upon his farm, in
Osage county, Kansas, 27 miles from the city of Topeka; he
purchased the entire tract described in the petition with the
intention and design of some day building a residence thereon
and coming to Topeka to live; he has lived in Osage county
for 35 years, and during all of that time has been in the habit
of coming to Topeka, sometimes at very frequent intervals,
and at other times not so often; in the last 10 years he has

only visited or seen the land described in the petition of the plaintiff but twice; he never had any actual notice from the city or anyone else concerning the building of the sidewalks which were laid on his property hereinbefore stated, and his first actual knowledge of any such sidewalks was when he discovered the tax therefor when he came to pay his taxes, and which charges he paid; in the year 1883, after the cross-walks were built and ditches dug, and in the spring of 1889, he went upon the premises, and for the first time, on his last visit, had any actual knowledge that the cross-walks hereinbefore found had been laid across his property; he never knew or had actual knowledge of any ditch having been dug or made by the city over the land in question until so informed on this trial; he had no knowledge of the platting of his lots by King in the plat heretofore found, except as he has ascertained on this trial; he has never authorized or consented to the same, and the plaintiff did not know that the railroad was built, or going to be built, until he saw it, in the spring of 1889.

"19. The land in controversy is correctly described in the petition, and lies in and is that part of what may be termed Twelfth street, commencing at the east line of Western avenue and extending westward 225 feet, and being 80 feet wide."

"21. Ever since the filing of the plat of King's addition to the city of Topeka, in 1869, Twelfth street, both east and west of the land in controversy, has been an open public street 80 feet wide.

"22. During the last 10 years the plaintiff has been in the city of Topeka at least 50 times, and several times in each year."

"25. The land in controversy lies two blocks south and five blocks west of the southwest corner of the square on which the Kansas state capitol is built.

"26. In 1883 the city of Topeka instituted proceedings for the condemnation of certain property, and among others condemned lands claimed by plaintiff, for the purpose of opening Western avenue, and the same was described in such proceedings as 'a tract 119 feet wide off of the east side of his tract of land, and running south in Western avenue to the north line of Twelfth street,' and awarded plaintiff therefor the sum of $350, which sum the plaintiff at the time accepted and still holds, and being that portion on the plat within red dotted lines."

Upon said findings of fact, the court found the issues in favor of the plaintiff below and entered judgment accordingly. Both parties are satisfied with the facts as found by the court, but the city challenges the conclusions of law arrived at by the trial court. It contends that the facts as found by the court show that the land in controversy belongs to the city, as a part of Twelfth street. Its first claim is that the land became established as a part of Twelfth street by prescription; and, second, that it became and is a part of such street by dedication.

Under the findings of fact, has the city obtained title to the land in controversy, as a part of Twelfth street, by prescription? We think not. Prescription is a mode of acquiring title by long-continued enjoyment. By some authors it is held to be based upon a prior, forgotten grant; by others, as applied to streets and highways, a grant is not considered the foundation of the claim, but it is based upon a presumed prior record, made according to law. Chief Justice Shaw says the right by prescription, as applied to a street, is founded upon the presumption that the way was, "at some anterior period, laid out and established by competent authority." The period during which it takes the user or enjoyment to ripen into a right by prescription varies with the decisions of the different states. But it seems to be pretty well settled that the user must be for a period of time equal to that fixed by statutes as the periods of limitations in respect to real actions. (3 Kent Com. 442; 12 Wend. 330; 19 id. 365; 27 Vt. 265; 4 Md. Ch. 386; 13 N. H. 360; 10 Serg. & R. 63; 9 Pick. 251; 14 Barb. 511; 3 Me. 120.)

The user, then, to create a title by prescription to a public street, must be under a claim of right by the public, adverse to the right of the owner, and continued without substantial interruption or change for a period equal to the statutory limitation in respect to actions for the recovery of real estate. (Elliott, Roads & St. 137.) In *Shellhouse v. The State*, 110 Ind. 509, the court says:

1. Street—user—title by prescription.

"Before a highway can be established by prescription, it

must appear that the general public, under a claim of right, and not by mere permission of the owner, used some defined way, without interruption or substantial change, for a period of 20 years or more."

In *Wallace v. Fletcher*, 30 N. H. 434, it was held that the enjoyment or user necessary to create title by prescription must be under claim of right, with the knowledge and acquiescence of the owner, and uninterrupted. In *The State v. Tucker*, 36 Iowa, 485, it was said that—

"To establish a highway by prescription, there must have been a general, uninterrupted use of the same, as such, by the public, under claim of right, for a period equal to that for the limitations of real actions."

The court, in *Graham v. Hartnett*, 10 Neb. 518, says:

"The existence of a legal public road over the premises of a private person may be shown by the user alone, but in such case the user must have been with the knowledge of the owner, and continued the length of time necessary to bar an action to recover title to the land."

In *The State v. Mitchell*, 58 Iowa, 567, the court says:

"A highway cannot be established by user alone, although the owner of the land had knowledge of such use, unless the owner also had express notice that a highway was claimed, independent of the mere use."

(41 Iowa, 693; 77 Pa. St. 432; 41 Wis. 490; 63 Me. 434; 30 Ind. 389; 103 id. 349; 55 Am. Rep. 618; 105 Mass. 317; 35 Wis. 376; and 108 Ill. 467.)

The findings in the case show that there has been more or less travel on the part of the public across and over the land in controversy since 1869, but there is nothing in the findings to show that the defendant had any knowledge of the user of his land by the public for such period, nor for any period equal to the period of the statute of limitations for real actions in this state. There is nothing in the findings to show that the occupancy by the public of the land, such as it was, was adverse to any right or use of such land by the plaintiff until 1879, when the city graded the land as a street and put ditches

along the sides thereof, and constructed cross-walks thereon. And the findings show that the owner had no knowledge of this having been done until the spring of 1889. The twenty-first finding is pointed out by the city as evidence that the land in controversy is a public street. Said finding reads as follows:

"Ever since the filing of the plat of King's addition to the city of Topeka, in 1869, Twelfth street, both east and west of the land in controversy, has been an open public street 80 feet wide."

This is somewhat modified by the fourteenth finding, which is as follows:

"That the first formal steps taken by the mayor and councilmen of the defendant city to open Twelfth street, to the east and to the west of the land in controversy, was in 1883."

If this finding is true, the city took no steps to open Twelfth street east and west of this land until 1883, and of course could not have opened Twelfth street across the land in controversy until 1883. From all of these facts as found by the court, it cannot be said that any of the conditions upon which the right to a street by prescription depends had 2. No prescript-ive right. any existence, except the mere user by the public without any knowledge of the owner. Such user under the law cannot ripen into a prescriptive right.

Under the facts found by the court, is the city entitled to the land in question by reason of its having been dedicated to said city? Again we must answer in the negative. Dedication is a setting apart of land for the public use. Dedication is either statutory or common-law dedication. There was no statutory dedication in this case. The plat filed by Zenas King was not filed with either the knowledge or consent of Mr. Cowee, the owner of the land, and he had no knowledge of its having been filed until after the commencement of this suit and not until the trial of the same. The plat itself notified the public that it was not intended to affect the land in dispute. Mr. Cowee was a non-resident of

23 — 48 KAS.

Topeka, living in Osage county, and saw this land but twice during the 10 years last before suit brought. Common-law dedications are either express or implied. There is nothing in the findings of the trial court that points toward an express dedication of the land by Cowee. On the other hand, the facts found negative the existence of an express dedication. If, then, there has been any dedication of the land to the public for a street, such dedication is an implied one, or dedication *in pais*. Such dedication rests, if at all, upon acts of the owner which forbid his denial of the existence of the street over the land in controversy. As said by the supreme court of the United States, "the law considers it in the nature of an estoppel *in pais*."

"He who claims against the owner of the fee an easement in lands must show either a grant, a continued user for 20 years, or facts from which an intent to dedicate the land can be fairly inferred." (Elliott, Roads & St. 96.)

"He who induces the public to believe his land a gift, or knowingly permits them to use or treat it as their own, until they have so accustomed themselves and adjusted their property and accommodated their business to it, that they cannot without detriment be dispossessed, confers that which he can no more resume without a wrong than he can rightfully seize what was acquired otherwise than by his gift." "In such cases the party is estopped on grounds of public policy and good faith from repudiating his own representations." (Elliott, Roads & St. 98.)

What acts of the owner of the land in controversy in this case evidence an intention to dedicate the land in question to the city for a street? We are unable to discover any in the findings of the court. These findings show that he purchased the land of which this land is a part for a residence lot, upon which some day, when ready, he proposes to build a home for himself. That he has maintained that purpose all these years since he obtained the land is further evidenced by the fact that he has never sold any portion of it. The whole tract is only 224 feet by 225 feet. What facts among those found by the court are pointed out by the plaintiff in

error as constituting matter of estoppel on the part of defendant, Cowee? It cannot be said that he permitted and encouraged the public to use the land as and for a street, because under the findings he knew nothing of such user until shortly before the commencement of his suit to recover the possession of the same. It is claimed, however, that he is estopped by the fact that the city appointed viewers to condemn a portion of his land to open up Western avenue, and that the notice described the land to be condemned as a strip off of the east side of Cowee's land and down to Twelfth street; and that said viewers reported damages to Cowee in the sum of $350, which he accepted from the city. The statement in the notice that the land to be condemned ran down to Twelfth street was the declaration of the city, and not of Cowee. Could Cowee be estopped by the declaration of the city that said condemnation proceedings would extend from some point to Twelfth street? We think not. He must be estopped by his own acts or declarations, or by the declarations of others in his presence, and under such circumstances as that his silence may be construed as an assent thereto.

Again, it is said that he built a livery stable on his land, fronting on Twelfth street. This barn was not erected until after this suit was begun, and after the defendant had thereby emphatically declared that he claimed the land in dispute. The findings of the court show that the city has assessed the land in controversy for taxation each year since Cowee purchased it, and that he has at all times paid the taxes thereon. This constitutes a strong indication that the city has not claimed the land as a part of her streets.

There are some other facts found by the court, in the shape of petitions to the city council for the establishment of streets and lanes in the neighborhood of this land, that strongly indicate that the people living about the land did not consider Twelfth street open across this land. But as the law requires the city to establish a dedication of this land to the public for a street by the owner thereof before it can maintain its claim

3. No dedication. thereto, and as we do not think there is anything in the findings that concludes the owner, we will not go more into the detail of such findings. We find no reason in the record why the judgment of the circuit court should be reversed, and therefore recommend that it be affirmed. (45 Md. 512; 110 Ind. 509; 108 Ill. 467; 96 U. S. 716; 103 Ind. 349; and 36 Iowa, 485.)

By the Court: It is so ordered.

All the Justices concurring.