No. 36,187

Frederick J. Kasper, and Frederick J. Kasper as Trustee of the Peter J. Kasper Investment Trust, *Appellant*, v. Harry G. Miller, Sr., Joseph Cohen, Martin G. Torson, Charles M. Torson, Fred Robertson, Thomas M. Van Cleave, Ruth G. Van Cleave, William M. Drennan, Carrie Zimmerman, Marie Louise Callender, Lana A. Linville, Helen Wells Haren, L. K. Wells, and Lydia M. McKenzie, *Appellees*.

(156 P. 2d 550)

Opinion filed March 10, 1945.

*William H. McCamish,* of Kansas City, argued the cause for the appellant.

*J. O. Emerson,* of Kansas City, argued the cause for the appellees.

The opinion of the court was delivered by

Wedell, J.: This was originally an action by alleged owners of a small triangular tract of ground in a residential district of

Kansas City to enjoin the city from enforcing an order cancelling a building permit thereon. The ground for many years had constituted a beauty spot and purchasers of lots in the vicinity believed it to be a public park.

The original action was expanded. The city and various lot owners joined in a motion to permit the lot owners to intervene and to be made parties defendant on the ground the latter had an interest in the controversy adverse to plaintiffs. A hearing was had on the motion and it was allowed. Attached to the motion was an answer of the intervening defendants which was later filed. Issues were joined by new pleadings of all the parties. Those pleadings will receive further attention later. For present purposes it is sufficient to state that plaintiffs ultimately, under their new pleadings, sought also the affirmative relief of having their title quieted against both the city and the intervening defendants.

The court sustained the city's demurrer to plaintiffs' evidence on the single issue of the building permit on the ground plaintiffs had not complied with the ordinances in their original application for a building permit. In support of a joint answer and cross petition of the city and the intervening defendants the city introduced evidence designed to disclose its ownership of the ground as a public park. The court determined the city did not establish its ownership of the ground and sustained plaintiffs' demurrer previously lodged against the city's evidence and rendered judgment against the city for the costs incident to the assertion of the city's claim. The extensive findings of fact and conclusions of law will receive further attention presently. In substance, however, the court concluded that as between plaintiffs and intervenors the tract of ground was a beauty spot and public park and that plaintiffs were estopped to contend otherwise. The plaintiffs, except Frank Youngs, with whom plaintiffs had contracted to erect a building on the ground involved, have appealed. The city has not appealed.

Before considering the appeal on its merits we are confronted with a motion of the intervening defendants, appellees, to dismiss the appeal. No notice of appeal was served on the plaintiff, Frank Youngs, or on the city. Appellees' motion is predicated upon two grounds. The first is that it is to the interests of both the city and the plaintiff, Frank Youngs, that the judgment of the trial court be upheld; that they are each interested in opposing the relief now sought by appellants and under the provisions of G. S. 1935, 60-3306 are adverse parties who must be served with notice of appeal in

order to maintain the appeal against appellees. While there may be some merit in appellees' first contention we prefer to direct our attention to other questions presented.

The second ground of appellees' motion is that the appeal must be dismissed for the reason appellants have failed to comply with the requirements of G. S. 1935, 60-3311 pertaining to the filing of a transcript. Appellees insist the transcript contains only a portion of the record and prevents their filing a counter abstract setting forth essential testimony not contained in appellants' abstract. The certificate of the court reporter covers only certain exhibits and with respect to the oral proceedings states:

". . . that the foregoing 202 pages are a true and correct transcript *of that part of the oral proceedings ordered for use on appeal* in the case of *Frederick J. Kasper et al. v. City of Kansas City, Kansas et al.*, No. 57311-A, and contain all of the testimony of the *intervening defendants* individually as to representations of J. A. Hoel in regard to Block 10, Westheight Manor No. 2, . . ." (Emphasis supplied.)

The parties did not stipulate that the limited portion of the proceedings ordered by appellants contained all the evidence required for a full review of the facts and that it constituted a sufficient transcript. Appellees deny the right of appellants to determine what testimony constitutes a complete transcript.

Appellants challenge certain important findings of fact. They contend some of the findings are not supported by the evidence and that others are contrary thereto and request that certain findings be modified and that additional findings be made. On the basis of the entire record before the trial court it overruled those motions. If appellees by reason of an incomplete transcript are unable to supplement appellants' abstract with a counter abstract how can this court determine the correctness of the trial court's findings of fact? Obviously we cannot reverse a trial court on a record different from the one upon which it made its findings. Neither can this court pass upon a disagreement of counsel on the question whether all material testimony is contained in the transcript furnished and we are not attempting to do so.

The most recent review of our decisions upon this subject is found in *Barker v. Chicago, R. I. & P. Rly. Co.*, 158 Kan. 549, 148 P. 2d 493. We held:

"Where parties seek appellate review of questions depending solely on the sufficiency of the evidence it is incumbent upon them, in the absence of a stipulation or agreement doing away with its necessity, to procure an official

transcript of all the evidence, and when they fail to furnish such transcript, or procure one containing only portions of the testimony, which is challenged as inadequate for an effective review, the evidence will not be reviewed and their appeal will be dismissed." (Syl.)

Failure to comply with the above rule may not always require a dismissal of the appeal with respect to all questions but it may greatly restrict the scope of appellate review. (*Barker v. Chicago, R. I. & P. Rly. Co.*, supra, p. 554.) So in the instant case we shall not consider appellants' challenge of the findings of. fact but shall restrict our review to the legal question, also raised below, whether the findings made support the conclusions of law. Before treating that question we must briefly notice a preliminary complaint.

Appellants direct our attention to a motion they filed to strike the original answer and cross petition of the intervenors from the files or, in the alternative, to have the cross petition of the intervenors docketed as a separate cause of action. The motion was denied. The principal ground of the motion urged was that several causes of action were improperly joined. Appellants concede the motion to strike was tantamount to a demurrer. Appellants did not appeal from that ruling but subsequently filed an amended petition against the intervening defendants and the defendant city in which they sought affirmative relief against all defendants. All defendants filed a joint answer and cross petition. Appellants filed a reply and an amended reply to that joint answer and cross petition. The action was fully tried upon the issues thus joined by all the parties. Appellants urge they were prejudiced by the joinder of the respective actions. That point was not specifically presented by the motion for a new trial. One ground of the motion was abuse of discretion by the court. In view of the broad provisions of G. S. 1935, 60-411 as to who may be made parties defendant and in the absence of an affirmative showing of prejudice which affected appellants' substantial rights we would not be justified in reversing the judgment on the ground the court abused its discretion in overruling the motion. This is especially true since the court eliminated the defendant city by sustaining a demurrer to the evidence offered by the city in support of the cross petition.

The question remaining is whether appellees are entitled to the relief prayed for, namely, a decree the ground in controversy was and is dedicated as a beauty spot or public park and that appellants are estopped to deny such dedication and enjoined from using it otherwise. That relief was granted upon evidence which to the trial

court was clear, satisfactory and convincing. The findings of fact are:

"1. Prior to April 27, 1915, Croydon W. Kerr was the owner of approximately 50 acres of land north of State avenue west of Eighteenth Street and east of Twenty-second Street, within the limits of the City of Kansas City, Kansas, said land being then almost entirely vacant and suitable for townsite platting.

"2. Prior to and during the year 1915, J. A. Hoel was engaged in the real estate business under the name of J. A. Hoel Realty Company.

"3. In the year of 1915, J. A. Hoel and J. O. Fife were instrumental in forming a syndicate or partnership consisting of J. O. Fife, R. O. Fife, Pence Kyger, Peter J. Kasper, W. C. Robinson, James Lorton, Grant Stafford and J. A. Hoel, to acquire by purchase a tract of land lying west of 18th Street, extending westward to Twenty-second Street. The purchase was made and title taken in the name of J. A. Hoel, who was given the exclusive selling agency, management and promotion of the enterprise. J. A. Hoel filed a plat of this ground, designating it as 'Westheight Manor Addition,' which was filed for record in August, 1915. This syndicate operated under the name of 'Westheight Manor Land Company No. 1.'

"4. In the year 1915, Hanford L. Kerr caused Hare & Hare, architects, to lay out and plat certain ground into lots and blocks prepared for sale as residences. He submitted this plat to the Board of Commissioners of Kansas City, Kansas, for approval; the commissioners approved the plat on the 28th day of June, 1915, and the same was filed for record on the 29th day of December, 1915, and recorded in plat book 13, page 16.

"Said plat had the following thereon and attached thereto as a part of the same: [Here follows description of subdivision by meets and bounds.]

" 'The undersigned proprietors of the above described tract of land have caused the same to be subdivided in the manner represented on the accompanying plat which subdivision shall hereafter be known as Westheight Manor No. 2.

" 'The lands reserved for sale are indicated therein by figures as blocks and lots.

" 'The privilege of using the rear 3 feet of all lots and 3 feet off the side of any lot that abuts to the rear lines of other lots in the Addition for public utilities and the right to have access to the pipes, poles and wires at all times is hereby reserved.

" 'The streets, avenues and alleys and parts thereof within the above described tract of land are hereby dedicated to public use as such.

" 'In testimony whereof, Hanford L. Kerr and Nettie Kerr, his wife, have hereunto subscribed their names.

HANFORD L. KERR.

[Acknowledgment.] NETTIE KERR.

" 'Approved by the Board of Commissioners of Kansas City, Kansas, on December 28, 1915.

HOWARD PAYNE, *City Clerk.*'

"5. Block 10 is shown upon the plat as reserved for private sale. It is not subdivided into lots. It contains fifteen or twenty thousand square feet. It is triangular in form, bounded on the east (base) by 22nd Street (212 feet);

on the south (altitude) by Washington Avenue (125 feet) and on the northwest (hypothenuse) by Washington Boulevard (189.5 feet). Twenty-second Street is 50 feet wide and is now improved for a width of 26 feet in the center leaving 12 feet of parkway or public ground, dedicated on the plat, between the curb and block line. Washington Avenue is 40 feet wide and now improved for a width of 40 feet, leaving a strip of public ground, dedicated on the plat, 2 feet wide between the curb and line of block 10. Washington Boulevard is 100 feet wide and is improved in center, a width of forty feet, leaving a strip of public land, dedicated on the plat, thirty feet in width between the curb and block 10 line.

"6. On April 16, 1917, J. A. Hoel secured an option to purchase all of Westheight Manor No. 2, excepting the Kerr homestead, at a price of $1,500 per acre and $7.50 per acre which Hanford L. Kerr had paid to Hare & Hare, architects, for preparing the plat; the acreage to be ascertained by actual survey and the purchase to include all inside streets and alleys and one-half of the outside streets.

"7. On April 25, 1917, J. A. Hoel offered to sell his option upon said property to J. O. Fife and Peter J. Kasper and their associates for $800, and to take the agency for management and selling the property (Plaintiffs' Exhibits 19 and 20.):

"8. A syndicate consisting of J. O. Fife, Peter J. Kasper, Frederick J. Kasper and Robert A. Kasper accepted J. A. Hoel's offer to sell his option and this syndicate operated under the name of 'Westheight Manor Land Company No. 2.'

"9. The syndicate above referred to arranged to have the title to the land which they were purchasing, and which at that time was vested in Hanford L. Kerr and Nettie Kerr, transferred to Edna Fife Betton, a daughter of J. O. Fife, and thereafter and on May 31, 1917, Hanford L. Kerr and Nettie Kerr by warranty deed conveyed the land constituting Westheight Manor No. 2 to Edna Fife Betton, which deed was filed of record on June 6, 1917, in the office of the Register of Deeds of Wyandotte County, Kansas. This conveyance from Hanford L. Kerr and his wife to Edna Fife Betton was made pursuant to instructions from J. A. Hoel and the members of the syndicate, purely as a business convenience for said J. A. Hoel and his associates, said Edna Fife Betton having no beneficial interest whatsoever in said land and said Edna Fife Betton held said deed with the understanding and agreement she had no control of the title involved, and could not make conveyances of said land except as directed to do so by said J. A. Hoel and his associates.

"10. The plat of Westheight Manor No. 2 has attached to it certain statements, three paragraphs of which are as follows: [Same as first three paragraphs set out and quoted under finding No. 4.]

"11. At the time of the conveyance to Edna Fife Betton in 1917, Westheight Manor No. 2 was farm land; no preparations had been made to clean up the land and get it ready for sale. There were trees, brush, a vineyard and debris on the land. The land was vacant, including Block 10, excepting for the Kerr Homestead.

"12. About the year of 1920, J. A. Hoel took charge of the property for

the above-mentioned syndicate and commenced the work of preparing the addition for the market; he employed men and teams to clear the land of trees and brush, to grade, level off, fill depressions and promote the improvement of the streets and to make the addition attractive by the planting of trees and shrubbery.

"13. On November 13, 1922, at the direction of J. A. Hoel and the members of the syndicate, Edna Fife Betton and her husband executed deeds transferring all their interest in Westheight Manor No. 2 to J. A. Hoel, said deed being recorded in book 654, page 463, in the office of the Register of Deeds of Wyandotte County, Kansas. There was nothing in this deed to indicate that it was for the benefit of anyone except said J. A. Hoel; that Edna Fife Betton and her husband had no financial interest in said property and, therefore, received nothing therefor when said deed was executed.

"14. The title to Westheight Manor No. 3 [2] remained in J. A. Hoel until September 15, 1927, at which time said J. A. Hoel and his wife conveyed block 10, among other properties, to Peter J. Kasper, the deed thereof being dated November 25, 1927, and recorded in book 765, page 499, in the office of the Register of Deeds of Wyandotte County, Kansas.

"15. On November 17, 1930, Peter J. Kasper and his wife conveyed block 10, among other properties, to William H. Kasper, by quit claim deed, recorded in book 825, page 316, in the office of the Register of Deeds of Wyandotte County, Kansas; and on April 11, 1931, William H. Kasper and his wife conveyed the same property to Peter J. Kasper in trust for the Peter J. Kasper Investment Trust, by deed recorded in book 825, page 318, in the office of the Register of Deeds of Wyandotte County, Kansas. On November 19, 1932, Peter J. Kasper and William H. Kasper executed a trust agreement, which was recorded in book 845, page 68, in the office of the Register of Deeds of Wyandotte County, Kansas.

"16. No written dedication, by the recorded plat, was ever made of block 10 to the City of Kansas City, Kansas, for use as a public park, nor for any other purpose.

"17. During all of the period of time from the deed conveying title to Westheight Manor No. 2 to Edna Fife Betton until J. A. Hoel and his wife made their deed to Peter J. Kasper in September, 1927, said J. A. Hoel had the implied, apparent, and complete authority, so far as the public and those who purchased land knew, to do with the addition as he pleased. It appeared to be his own. Having that authority, he made use of said block 10 as a means to assist in the sale and induce purchase of building lots which were in the neighborhood of that block, by reperesenting and stating that Block 10, Westheight Manor No. 2, was and always would remain a beauty spot and public park, and that it had been made a public park for the benefit of the public; that as a result of such representations, lots in said addition were sold to individuals relying upon such representations, and said J. A. Hoel and the members of the syndicate owning said Westheight Manor No. 2, received a financial gain therefrom.

"18. That the statements and representations made by said J. A. Hoel were open and notorious, and made over a period of years during the development of Westheight Manor No. 2.

"19. That so far as the public was concerned, and those who dealt with Mr. Hoel in purchasing property in Westheight Manor No. 2, said J. A. Hoel appeared to be the owner in sole, complete, and absolute control of the land constituting Westheight Manor No. 2.

"20. (As amended). That although the other building sites in Westheight Manor No. 2 were, over a period of years, sold and improvements built thereon, no sale was made of block 10 and no apparent effort was being made to dispose of said block 10, for a building site which facts were consistent with the representations made by said J. A. Hoel that said block 10 was a beauty spot or public park and not a building site.

"21. That said J. A. Hoel induced officers of the City of Kansas City, Kansas, to perform work upon Block 10, Westheight Manor No. 2, including the planting of trees and shrubs, all of which was paid for out of the public funds of the City of Kansas City, Kansas. In addition to this, said J. A. Hoel spent money of the association of individuals in improving Block 10 and Westheight Manor No. 2 generally.

"22. That when the intervenor, Harry G. Miller, purchased his lot from J. A. Hoel, in August, 1920, said J. A. Hoel represented to him that Block 10, Westheight Manor No. 2, was a park, a permanent beauty spot existing for the benefit of the public, and said Harry G. Miller believed these representations, relied on them, and purchased property and built expensive improvements thereon. That during said negotiations, said J. A. Hoel displayed a map to said Harry G. Miller, showing Block 10, Westheight Manor No. 2, marked differently from the other lots and blocks of the addition, and stated that the map represented block 10 as a park. That said Harry G. Miller would not have purchased his lot and built the expensive improvements thereon had he not believed in the representations of said J. A. Hoel.

"23. That when the intervenor, Fred Robertson, purchased his lot in Westheight Manor No. 2, said J. A. Hoel, represented to him that Block 10, Westheight Manor No. 2, was a public park and would always remain as such.

"24. That when the property now owned by the intervenor, Helen Wells Haren, was purchased by her father, C. K. Wells, now deceased, the said J. A. Hoel represented to the said C. K. Wells that a monument was to be built on Block 10, Westheight Manor No. 2, and said J. A. Hoel displayed a map upon which said Block 10, Westheight Manor No. 2, was marked as a park.

"25. That said J. A. Hoel made similar representations and statements to the intervenors, Lydia M. McKenzie, Marie Louise Callender, and Lana A. Linville.

"26. That E. L. Redmond and W. A. Seymour, sales agents of J. A. Hoel, were induced by said J. A. Hoel to represent to prospective purchasers that Block 10, Westheight Manor No. 2, was a public park.

"27. That some of the records in the office of the Park Commissioner of the City of Kansas City, Kansas, show Block 10, Westheight Manor No. 2, as a public park, while others did not list it as such.

"28. That at intervals during the development of Westheight Manor No. 2, and until the filing of this action, 'For Sale' signs were placed on Block 10,

Westheight Manor No. 2. However, the testimony does not show or lead the court to believe that said signs were on block 10 when any of the intervenors herein purchased their property and when said J. A. Hoel made the representations referred to herein.

"29. That Block 10, Westheight Manor No. 2, has always been used as a playground for the neighborhood children, although no playground apparatus, shelter house or other structure was ever placed thereon.

"30. That Block 10, Westheight Manor No. 2, is irregular in shape and has always been maintained in about the same manner as the other dedicated tracts of land in the additions promoted by J. A. Hoel and his associates.

"31. That during all the years since 1915, block 10 has been on the tax rolls of Wyandotte County and that the City of Kansas City, Kansas, has certified its levy and received its share of general taxes levied against and collected the same.

"32. The City of Kansas City, Kansas, has levied and collected special assessments over a period of ten years, from the time of the filing of the plat of Westheight Manor No. 2, on Block 10 for street improvements, sewers, and ornamental lights.

"33. The city auditor in his annual report has not listed in any year since the year 1915 up to date, said block 10 as city property.

"34. All property now owned by the intervening defendants was sold and conveyed by reference to the recorded plat of Westheight Manor No. 2.

"35. There was no zoning ordinance of Kansas City, Kansas, until August 8, 1924, at which time one was passed, a copy of which is attached to the amended petition of plaintiffs. A zoning map of the city was later prepared in 1924 pursuant to ordinance, and became a part of the records of the city. It shows that said block 10 was in the region of the zone for family dwellings, but it did not show that block 10 was set aside as a city park.

"36. (As amended). In the year 1938, a petition of property owners, among which was Harry G. Miller, in the immediate vicinity of block 10, was filed with the city clerk, requesting the board of city commissioners to acquire block 10 as a city park by purchase or condemnation; the records fail to show any action taken thereon or any claim of ownership by the city at that time. About the same time a letter was filed with the city clerk, signed by Fred Robertson, one of the intervening defendants herein, requesting the city commissioners to take steps to acquire said block as a city park, and there is no record of any action in response to said letter or any evidence that any city commissioner claimed or stated that block 10 was already a public park. These instances transpired after the intervening defendants had purchased their property in Westheight Manor No. 2, and after J. A. Hoel had made the representations referred to in these findings of fact, and after the rights of the intervening defendants had become vested.

"37. On Sunday, January 15, 1939, without any permit or legal right to do so, in violation of law, plaintiffs attempted to start construction of certain buildings upon Block 10, Westheight Manor No. 2. This clandestine action upon the part of the plaintiffs convinces the court that they had knowledge

of the representations made by J. A. Hoel concerning Block. 10, Westheight Manor No. 2, and were attempting to prevent the intervenors from asserting their vested rights.

"38. (As amended). That on the 25th day of August, 1920, Harry G. Miller secured a deed to Lot 5, Block 16, Westheight Manor No. 2, in which deed J. O. Fife and wife were grantors.

"39. The court finds that to permit the plaintiffs to improve Block 10, Westheight Manor No. 2, Kansas City, Kansas, for a residence or other private purposes, or to convert the same to any other use than that of a beauty spot and public park, would cause the intervening defendants damage, permanent in character, not measurable in money, from which the intervening defendants would have no adequate remedy at law."

Upon those findings the court concluded as a matter of law:

"I. The defendant, City of Kansas City, Kansas, has failed to present sufficient facts to constitute a cause of action in favor of the City of Kansas City, Kansas, as against the plaintiffs. For that reason the demurrer of the plaintiffs heretofore filed is hereby sustained.

"II. That J. A. Hoel in making the statements and representations, referred to in the findings of fact, was acting as the agent and for the benefit of the syndicate which he represented, and that said J. A. Hoel was held out by said syndicate to have the apparent authority to make such statements and representations, and, therefore, said syndicate is bound by the statements and representations made by its duly authorized agent, J. A. Hoel.

"III. That plaintiffs are estopped as against the intervening defendants to deny that Block 10, Westheight Manor No. 2, is a beauty spot or public park.

"IV. That plaintiffs are estopped from using Block 10, Westheight Manor No. 2, for any other purpose than a beauty spot or public park.

"V. That plaintiffs are estopped from conveying said Block 10, Westheight Manor No. 2, for any use otherwise than a beauty spot or public park.

"VI. That said Block 10, Westheight Manor No. 2, is restricted to use as a beauty spot or public park and against the use as a building site.

"VII. That the plaintiffs threatened by their conduct January 15, 1939, to use said Block 10, Westheight Manor No. 2, as a building site, and, therefore, they should be perpetually enjoined from using said block 10 as a building site or for any other purpose except a beauty spot or public park."

The findings of fact and conclusion of law No. 1 clearly indicate not only that the city was eliminated from the lawsuit but also the reasons for the judgment against it. We think the findings and conclusions also plainly indicate the basis upon which relief was granted to appellees. There was no formal dedication of block 10 and appellees did not rely upon such dedication. No formal acceptance of a dedication by any particular authorities is essential. (*Cemetery Association v. Meninger*, 14 Kan. 312, 316; *Raymond v.*

*Wichita,* 70 Kan. 523, 524, 79 Pac. 323.) The judgment in favor of appellees was predicated upon the doctrine of dedication by estoppel. That dedication may be so established was early and definitely determined in this state. (*Cemetery Association v. Meninger; Raymond v. Wichita,* both supra; *Kansas City v. Burke,* 92 Kan. 531, 535, 141 Pac. 562; *Craig v. Zitnik,* 130 Kan. 731, 734, 288 Pac. 572; see, also, *Weger v. Delran,* 61 N. J. L. 224, 226, 39 Atl. 730; *Village of Princeville v. Auten et al.,* 77 Ill. 325; Revised Vol. 4 McQuillin, Municipal Corporations, 2d ed., § 1720; and for a recent case not directly in point, but informative, see *Fortson Investment Co. v. Oklahoma City,* 179 Okla. 473, 66 P. 2d 96.)

There are three parties interested in every dedication—the dedicator and his representative, the general public and property owners with special interests. (*State, ex rel., v. City of Manhattan,* 115 Kan. 794, 225 Pac. 85.)

In the cemetery case, *supra,* it was said:

"No formal acceptance by any particular authorities is essential. The mere user by the public may be of such a character as to constitute an acceptance. Indeed, such user by the public with the knowledge of the owner may be sufficient evidence of both the dedication and the acceptance. We know this doctrine is denied by some courts, but it seems to us to rest upon the soundest principles." (p. 316.)

In the Raymond case, *supra,* it was said:

" 'The public, as well as individuals, have a right to rely on the conduct of the owner as indicative of his intent. If the acts are such as would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate, and they are so received and acted upon by the public, the owner cannot, after acceptance by the public, recall the appropriation. Regard is to be had to the character and effect of the open and known acts, and not to any latent or hidden purpose.' (Ell. Roads & Str. § 124.)" (p 532.)

In the Weger case, *supra,* it was stated:

"Although the map did not designate this block in words, as a 'square' or 'park,' yet it contained persuasive evidence that it was intended for a different use than that to which the other blocks were designed to be put, and from Bechtold's acts and declarations, which were admissible evidence, there was the plain inference capable of being drawn that he intended to dedicate the block to public use, as was found by the trial judge in accordance with the cases in this state respecting the dedication of lands to public uses." (p. 226.)

Here the evidence, to the trier of the facts, was clear, satisfactory and convincing that:

The representations that block 10 was a beauty spot or public park and would always remain so were employed for the express

purpose of inducing the sale of lots in the vicinity to prospective purchasers; the representations had the intended effect; appellants benefited financially therefrom; the city was induced to expend the money of taxpayers to beautify the block; appellants or their predecessors in title also beautified it as a park; children used it as such for many years; for a period exceeding fifteen years it was to all intents and purposes maintained in harmony with the representations which had been open and notorious that it was a permanent beauty spot or park for the benefit of the public.

In January, 1939, appellants evidenced a contrary intention by attempting to start construction of buildings thereon. In February, 1939, they filed the instant action against the city. Appellees promptly asserted their rights.

Appellants argue the doctrine of equitable estoppel is not available to one who has knowledge of the true condition of title or to whom such knowledge is readily accessible. That general principle must be conceded but it cannot produce a reversal of the judgment, under the findings of fact in the instant case. As previously stated, we are obliged to limit our review to the question whether the findings support the conclusions of law. We think they do. Having reached that conclusion other questions raised by appellants are not material.

The judgment is affirmed.

HARVEY, C. J. (concurring in part only): I see no reason for the opinion to go further than to pass upon the decision of the trial court from which an appeal was taken. I understand our main question here is to determine whether or not the findings support the conclusion of the trial court that the plaintiffs are estopped as against the individual appellees from contending that the area in question is not to be maintained as a beauty spot and/or public park. I agree that there are findings to sustain the judgment of the trial court that plaintiffs are so estopped. The trial court held against the city on its contention that the area is a public park, and from this there has been no appeal. If the situation is left as it was decided by the trial court as between the plaintiffs and the individual defendants it is possible for plaintiffs to make some agreement with them by which they can make some use of the area. I think we ought not to write the opinion so as to deprive plaintiffs of that right.

BURCH, J., joins in the foregoing concurring opinion.