No. 47,979

ERNEST L. KRATINA and WILMA J. KRATINA, *Appellants*, v. THE BOARD OF COMMISSIONERS OF SHAWNEE COUNTY, KANSAS and THE TOWNSHIP BOARD OF AUBURN, KANSAS, *Appellees*.

(548 P. 2d 1232)

Opinion filed April 10, 1976.

*William R. Brady,* of Topeka, argued the cause and was on the brief for the appellants.

*Matthew J. Dowd,* county counselor, argued the cause, and *William Hergenreter,* of Shaw, Hergenreter, Quarnstrom and Wright, of Topeka, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: The issue in this case is whether the public has acquired a right of way for a public road across plaintiffs' land by prescription.

The action was precipitated when the Auburn township board started to clear brush from and otherwise improve an old roadway running a half mile across the north edge of plaintiffs' quarter section of land in southwest Shawnee county. The township board was acting under the authority of an order of the county commissioners dated October 19, 1971, which purported to open the road under

K. S. A. 68-114. Plaintiff landowners sued both the township board and the county commissioners to enjoin further construction, for damages incurred by the work already done, and to quiet their title.

On January 17, 1973, the trial court restrained, and later temporarily enjoined the defendants from further construction work. At the pre-trial conference the road opening of 1971 was declared void for lack of notice to plaintiffs, and the issues of title and damages were reserved for trial. The defendants claimed a public road by prescription had been established no later than 1935.

Trial was held on August 8, 1974, at the conclusion of which the court found generally in favor of the defendant county and township, set aside the temporary injunction, and specifically ruled:

". . . that a prescriptive use in the public has been established so as to create a public way situated in Section 26, Township 13, Range 14 East in Shawnee County, the length of which is from Hodges Road on the west approximately one-half of a mile east to where the Topeka-Eskridge Road intersected with said road; the width of said road is from rock wall on the north to a rock wall on the south for the entire length of the road. The defenses of permission, interruption, and restriction have not been established to the court's satisfaction by the plaintiffs."

Plaintiffs' motion for a new trial was overruled and they have appealed. Their basic contention is that the evidence was insufficient to establish the elements of a prescriptive use.

The trial court made no findings of fact, and we are left to sift through the evidence in the record on our own. Insofar as relevant, that evidence shows in substance:

Plaintiffs' land is in the southwest quarter of the section 26 described in the trial court's order. It is located less than a mile south and west of the town of Auburn. The disputed road runs from Hodges road, a north-south road on the west section line, ½ mile east on the half-section line to the center of the section.

In 1874 the Shawnee county commissioners opened the Topeka-Eskridge road, a state road 100 feet wide running from Topeka generally southwest through the town of Auburn to Eskridge, in Wabaunsee county. It ran north-south through section 26 on the half-mile line. There is conflicting testimony as to whether it ever actually intersected with the disputed road at the center of the section. However, two long-time residents of the area each testified he had been told—one by his parents and grandparents, the other by "the oldtimers"—that it used to be the traveled road to Auburn for people living in the area. If so, the two roads obviously intersected at one time. The trial court apparently found that they did,

since the journal entry defines the road as extending "approximately one-half of a mile east to where the Topeka-Eskridge Road intersected with said road."

The two long-time residents, John Yeager and Nathan Brobst, each owned land in the northwest quarter of section 26. Their land adjoined the disputed road until each recently sold a portion. Mr. Yeager's memory went back until 1922 or 1923. There was an east-west road then, but by that time it came to a dead end at the middle of the section. People lived down the road and it was a traveled way until the mid 1930's when a bridge washed out about two-thirds of the way back. When the bridge washed out there was no access to the houses toward the east end and the people living there moved out. Until then the people who lived there and "[o]ther farmers and people in the area used this road to a degree."

Mr. Brobst's memory went back to about 1913 or 1914, and there was a road there at that time. From then until the bridge washed out in the 1930's the road was in use for travel. He never saw anyone use the Topeka-Eskridge road going north from the center of the section, but there was evidence of its existence at one time in the form of wagon tracks. It hadn't been used for 60 years, and the north one-half mile had been formally vacated in the 1950's.

All witnesses agreed that from time immemorial the disputed road had a stone wall on each side, some 50 to 60 feet apart. The north wall was on the half-section line, so the entire road was on plaintiffs' property. After the bridge washed out in the 1930's the north wall was taken down by agreement between Mr. Yeager's father and plaintiffs' predecessor in title. The rock was used on the township roads.

Except for the abortive proceedings of 1971 there was no evidence that the road had ever been formally dedicated or opened, or that it was ever officially recognized as a part of the county or township road system. Victor Loebsack, who owned plaintiffs' land in the late 1950's, once looked into improving the road if the public would maintain it. He was told by the county engineer that it had never been dedicated, and formal road opening proceedings would be necessary.

After the bridge washed out Mr. Yeager and Mr. Brobst maintained the road; before that it was maintained by the people living in the neighborhood. Most significant, in the court's view, is the fact that there had never been any public maintenance.

Is this evidence sufficient to establish a public highway across

plaintiffs' land? In Kansas as elsewhere a public roadway may be established in three different ways: by purchase or condemnation, by prescription, or by dedication. Dedication may be either statutory, as by the filing of a plat, or common law. In this case there were no official proceedings to open the road and no claim of dedication, so we are concerned only with prescription.

The basic elements of that doctrine were set forth in *Shanks v. Robertson,* 101 Kan. 463, 465, 168 Pac. 316, where the court quoted and applied the following from 37 Cyc. 21:

"To establish a highway by prescription the land in question must have been used by the public with the actual or implied knowledge of the landowner, adversely under claim or color of right, and not merely by the owner's permission, and continuously and uninterruptedly, for the period required to bar an action for the recovery of possession of land or otherwise prescribed by statute. When these conditions are present a highway exists by prescription; otherwise not."

The identical language (with references to sections of the text discussing each element) now appears in 39 C. J. S., *Highways,* § 4. It was found controlling and applied in *Kring v. West,* 133 Kan. 455, 300 Pac. 1080. As may be seen, the concept is closely akin to adverse possession. We have recognized the similarities in cases involving private easements claimed under prescription. *Fiest v. Steere,* 175 Kan. 1, 259 P. 2d 140; *Taylor Investment Co. v. Kansas City Power & Light Co.,* 182 Kan. 511, 322 P. 2d 817, Syl. ¶ 1. In *City of Osawatomie v. Slayman,* 185 Kan. 631, 347 P. 2d 405, we approved jury instructions which stated in substance:

". . . A public way may be established by prescription by fifteen years' adverse possession if during the time the public openly, notoriously, and adversely uses the land against the landowner's will. Use by the owner's permission will not ripen into adverse possession no matter how long used." (*Id.* at 634.)

It will be observed that an "adverse" use is an essential element. Of this it has been said:

"Nowhere is the confusion as to the exact theory of prescription more evident than in the element of adverseness of use. If we are to follow the fiction of a lost grant, then the user must be with the approval of the owner of the fee. But if prescription is analogous to adverse possession, the use must be against the fee holder's wishes. The use must be such as to clearly indicate that it is claimed as a right and is not the effect of indulgence or anything short of a grant. It must be such an invasion of the rights of the owner that he could have maintained an action against the user." (2 Thompson on Real Property, 1961 ed., § 341.)

The "fiction of a lost grant" referred to has obscure origins in antiquity, and forms the earliest foundations for the concept of prescription. As noted in Thompson, *supra*, § 337, where the lost grant theory is discussed at length, "[m]uch of the misunderstanding and confusion that surrounds the courts' treatment of prescription comes from the historical fog out of which the doctrine emerged." The idea of the lost grant is that the owner of the land would not knowingly acquiesce in its use by others claiming as a matter of right for such a long period if he or his predecessors had not expressly granted such a right. It is a fiction, it is said, in which even the courts do not believe. It is nevertheless so strong a fiction that the owner will not be heard to testify that he in fact never made such a grant.

In this state we have never expressly recognized the "lost grant" theory, nor have we rejected it. The closest we have come was in *City of Topeka v. Cowee*, 48 Kan. 345, 29 Pac. 560, where the court observed:

". . . Prescription is a mode of acquiring title by long-continued enjoyment. By some authors it is held to be based upon a prior, forgotten grant; by others, as applied to streets and highways, a grant is not considered the foundation of the claim, but it is based upon a presumed prior record, made according to law. Chief Justice Shaw says the right by prescription, as applied to a street, is founded upon the presumption that the way was, 'at some anterior period, laid out and established by competent authority.' The period during which it takes the user or enjoyment to ripen into a right by prescription varies with the decisions of the different states. But it seems to be pretty well settled that the user must be for a period of time equal to that fixed by statutes as the periods of limitations in respect to real actions." (p. 351.)

In that case the plaintiff Cowee acquired his land in 1868 and 1871. When he brought suit in 1891, Twelfth street in the city of Topeka had been an open street 80 feet wide both east and west of his property since 1869. From then until trial there had been a publicly traveled way across plaintiff's land some 20 feet wide, starting with random travel and increasing in use as the population increased. In 1879 the city graded a road across plaintiff's land and installed ditches and cross walks. Plaintiff, who lived on a farm in Osage county, didn't discover the city's action until he visited his city property in 1889. The court found first that there was no user by the public *adverse* to the plaintiff until the city graded the street in 1879. At best the evidence showed "the mere user by the public without any knowledge of the owner. Such user under the law cannot ripen into a prescriptive right." (*Id.* at 353.) Then, finding the

first act by the city occurred less than 15 years before suit, the court held there was no road by prescription.

A similar result was reached in *State v. Horn*, 35 Kan. 717, 12 Pac. 148, where the defendant was convicted of obstructing a public road. On appeal the issue was whether the road had been established as a public road by prescription. It appears that use of the road began in 1868, when it was an Indian trail through open and unfenced land. In 1869 there was an attempted road opening, but that proceeding was found to be fatally defective. Some time thereafter the township road overseer began maintaining the road. The prosecution was instituted in 1884, less than the fifteen year prescriptive time after the attempt to open the road.

The court held that public travel over vacant and unoccupied land was not a sufficient public user to start the prescriptive time running. The court said:

". . . Individuals travel over the ground merely because it is convenient for them to do so, and generally without any expectation or design or authority to constitute the place where they travel a public highway; and by such traveling they cannot set in operation any prescriptive right, or any right by limitation. In order to start in operation any prescriptive right, or any right by limitation, to use a piece of ground as a public highway, the public by its constituted authorities must take the actual possession of the ground and use it as a public highway." (35 Kan. at 721.)

Since the public maintenance began less than 15 years before the prosecution the road had not been established by prescription.

In each of those cases, as in any prescription case, the question was what kind of public user was so clearly "adverse" to the owner's rights as to start the prescriptive period running. In each it was held that only when the public officials took steps to improve or maintain the road was there evidence clearly establishing that the public looked on the road as a public way and used it as a matter of claimed right. The court has concluded that these cases represent a concept which should be universally applied.

Mere use by the traveling public is ambiguous. If done with the owner's permission there can never be a public road, no matter how long the use is continued. *City of Osawatomie v. Slayman*, supra; *State v. Horn*, supra. It is clear the owner must have knowledge of the use in order to give rise to a prescriptive right. *City of Topeka v. Cowee*, supra; *Shanks v. Robertson*, supra. But whether the owner is "permitting" the use, so it is not adverse, or is "acquiescing" in it so that it *is* adverse, can never be established simply by showing that travelers are using a roadway. By the same token, mere use

by the traveling public does not establish whether it collectively or any members of it claim to be using the road as a matter of right, so as to be adverse, or whether the public understands explicitly or implicitly that its use is with the owner's permission.

On the other hand, where public officials take some positive action, either formally or informally, such as improving or maintaining the road, the intention of the public at least is unmistakable. County commissioners, township boards and city governing bodies have no authority, and are not frequently known, to devote public money to private roads. When a road is worked by public authorities the owner is chargeable with the knowledge that they do so under a claim of right. If they do so for the prescriptive period we may then, if need be, either indulge in the fiction of a lost grant, or rely on the presumption of a prior legal proceeding alluded to in *City of Topeka v. Cowee,* supra.

Or, as we have sometimes said, we can find an "implied dedication" or a "dedication by estoppel." That is to say, when an owner by his conduct has led the public to believe he has dedicated land to public use and the public has relied on that belief to its detriment, he will be estopped to deny the dedication. This was the basis of the holdings, based on public maintenance, in *Raymond v. Wichita,* 70 Kan. 523, 79 Pac. 323; and *Kansas City v. Burke,* 92 Kan. 531, 141 Pac. 562. In *Kasper v. Miller,* 159 Kan. 488, 156 P. 2d 550, it was applied to a public park which had been improved by the city and used by the public for more than 15 years.

As may be seen, an implied dedication or dedication by estoppel is closely akin to the "lost grant" theory of prescription. Obviously in a highway case any "lost grant" must be to the public, and as in the case of any grant there must be acceptance. One of our earliest implied dedication cases was *Cemetery Ass'n v. Meninger,* 14 Kan. 312. The court there said:

". . . In order to constitute a way a public road, outside of cases of condemnation, and possibly of prescription, it is said that two things are essential: *First,* a dedication by the owner of the soil; and *second,* an acceptance by the public." (p. 316.)

The court then noted that the emphasis in the evidence will be different when the action is one to enjoin the owner from obstructing the road from that in a case to force the public authorities to maintain it. In the former the effort is to prove a dedication, while in the latter it is to prove acceptance, "[f]or the mere fact that a

land-owner has dedicated certain land to the use of the public does not necessarily cast upon an unwilling public the duty of improving and keeping it in repair." The court went on to say:

". . . No formal acceptance by any particular authorities is essential. The mere user by the public may be of such a character as to constitute an acceptance. Indeed, such user by the public with the knowledge of the owner may be sufficient evidence of both the dedication and the acceptance. We know this doctrine is denied by some courts, but it seems to us to rest upon the soundest principles." (*Ibid.*)

We are for practical purposes unable to distinguish the situation referred to, where "mere user" establishes both dedication and acceptance, from the situation where "mere user" establishes a public roadway by prescription. In either case a roadway is established regardless of the subjective intent of the owner. Whether we call the process prescription or implied dedication, we think mere travel by the public is not enough to deprive an owner of his land. Although we would agree that no "formal acceptance" by the public authorities is necessary, we do believe some sort of action by them indicating acceptance is required. Otherwise there would be "cast upon an unwilling public" the duty to maintain—a situation found untenable by the *Cemetery Ass'n* court.

We must concede that in holding some sort of action by public officials is required we are running counter to what was said in such prescription cases as *Shanks v. Robertson*, supra, and *Kring v. West*, supra. It is also contrary to statements found in such implied dedication cases as *Cemetery Ass'n v. Meninger*, supra; *Raymond v. Wichita*, supra; and *Kansas City v. Burke*, supra. On the other hand, it is consistent with the facts if not the rationale of *Meade v. Topeka*, 75 Kan. 61, 88 Pac. 574, and *City of Kingman v. Wagner*, 168 Kan. 558, 213 P. 2d 979. In those cases, as well as some cited earlier, the public authorities had in fact maintained the road but that fact was not considered controlling.

In any event, the court is satisfied that the rule adopted here is the more equitable one, and will resolve the difficulties inherent in attempting to determine the intent of a landowner and of the public on the basis of ambiguous acts alone. The cases just cited and others, to the extent that they support the establishment of a public road based on public travel alone, and dispense with any action by public authorities, are disapproved.

In this case there was never any recognition, formal or informal, of the disputed road by any public body. Under the rule just an-

nounced there could be no public road by prescription. The judgment is therefore reversed and the case is remanded for further proceedings in harmony with this opinion.

APPROVED BY THE COURT.